**E-FILED**
Monday, 06 August, 2007  11:57:57 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| LESTER GAYTON, JR., Administrator of | ) | |
| the Estate of India Taylor, Deceased, | ) | |
| Plaintiff | ) | |
| v. | ) | Case No. 04-1354 |
| MICHAEL D. McCOY, Sheriff of Peoria | ) | |
| County, Illinois in His Individual & | ) | |
| Official Capacities, STEVEN S. SMITH, | ) | |
| Corrections Superintendent of Peoria | ) | |
| County, Illinois in His Individual and | ) | |
| Official Capacities, AMANDA ECCLES, | ) | |
| Jail Officer in Her Individual and Official | ) | |
| Capacities, MELINDA BROWNELL, Jail | ) | |
| Officer in Her Individual and Official | ) | |
| Capacities, APRIL CUMMINGS, Jail Officer | ) | |
| in Her Individual and Official Capacities, | ) | |
| OLIVIA RADCLIFF, a Nurse of Advanced | ) | |
| Correctional Health Care, Inc., in Her | ) | |
| Individual and Official Capacities, | ) | |
| PATRICIA MATTUS, a Nurse of Advanced | ) | |
| Correctional Health Care, Inc. in her Individual | ) | |
| and Official Capacities, PAM HIBBERT, a | ) | |
| Nurse of Advanced Correctional Health Care, Inc. | ) | |
| in her Individual and Official Capacities, | ) | |
| ADVANCED CORRECTIONAL HEALTH | ) | |
| CARE, INC., a Corporation, and | ) | |
| NORMAN JOHNSON, M.D., President of | ) | |
| Advanced Correctional Health Care, Inc, in his | ) | |
| Individual and Official Capacities, and | ) | |
| PEORIA COUNTY, ILLINOIS, a Political | ) | |
| Subdivision of the State of Illinois | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT
OF DEFENDANTS, MICHAEL MCCOY, SHERIFF OF PEORIA COUNTY,
ILLINOIS AND STEVEN SMITH, SUPERINTENDENT OF JAILS**

---

Now comes the Plaintiff, LESTER GAYTON, Administrator of the Estate of India

Taylor, Deceased, by RICHARD L. STEAGALL, his attorney and for Plaintiff's Response to

Motion for Summary Judgment of Defendants, MICHAEL MCCOY, SHERIFF OF PEORIA

COUNTY, ILLINOIS, and STEVEN SMITH, SUPERINTENDENT OF JAILS, state:

## I.
## Introduction

Sheriff McCoy contracted medical services at the Peoria County Jail to defendant, Advanced Correctional Health Care, Inc. 127:Ex:1:JohnsonDep:7.[1] That business corporation is owned and operated by defendant, Norman Johnson, M.D. Id. The Advanced Correctional Health Care corporation employed the Nurse Defendants, Olivia Radcliff, Patricia Mattus, and Pam Hibbert, to provide nursing services at the Jail. 127:Ex:1:JohnsonDep:28-30.

Discovery has shown the Jail Officers, Amanda Eccles, Melinda Brownell, and April Cummings did everything they could to get the Advanced Correctional Health Care Nurses to provide medical care to India Taylor.  The court has granted plaintiff's motion for voluntary dismissal of the Jail Officers, Amanda Eccles, Melinda Brownell, and April Cummings. 148; August 6, 2007 Order.

The Plaintiff's Responses to the Motions for Summary Judgment of the Advanced Correctional Health Care Defendants have fully discussed the denial of necessary medical care to India Taylor and its effect on Taylor's death. 142, 144, 146.  This response will address those denials to the extent necessary for the claims against Sheriff McCoy and Superintendent Smith.

The Nurse Defendants did not provide the prescriptions for the sophisticated diuretic and hypertensive medication India Taylor's cardiomyopathy (congestive heart failure) required..

---

[1] J"127:Ex:1:JohnsonDep:28-30" refers to Dckt #127, Exhibit #1, Johnson Deposition, pp. 33-34. This was sometimes mistakenly referred to as "137" in the response to the motion of the nurse defendants. 144:12.  "Ex:1:125-126; 129-30" refers to Exhibit 1, pages 125-26 and 129-30 of Plaintiff's Exhibits to His Responses to Defendants' Motions for Summary Judgment. 149. "149" refers to Dckt #149.

Ex:1:114-123.  Jail Officer Brownell filled out the Jail Intake Screening Form for Taylor listing

her prescriptions and chest pain. The Advanced Correctional Health Care protocols required a

physician examination of patients with chest pain to determine cardiac etiologies. Taylor said her

family would get the prescriptions. Ex:2. Nurse Radcliff made a note in the chart that Dr.

Johnson was to be called if the prescriptions were not received. Ex:114-123. Nurse Radcliff,

Mattes, and Hibbert never followed up on this note. Taylor never received her medications.

Taylor's cardiologist, Paul Schmidt, M.D., testified to the severity of Taylor's condition and the

need to take her medications. 127:Ex:17:Schmidt Dep:26. Her mortality rate without medication

was 40% to 60% within one year, but that improves 50%-70% with medications. Id:28, 31.

Jail Officers Brownell and Amanda Eccles took Taylor to a video bonding hearing on

October 16, 2003 at 15:00.  She was vomiting.  They telephoned Nurse Pam Hibbert to arrange

for an examination of the heroin withdrawal they believed Taylor was undergoing.  127: Ex: 5:

BrownellDep:27-30; 127:Ex:6:EcclesDep: Brownell and Eccles retrieved the vomiting from the

garbage can for Nurse Hibbert's examination.  Nurse Hibbert refused the examination saying the

Nurse on the next shift at 20:00 could do it. Jail Officers Brownell and Eccles prepared a Sick

Call Request Form for India Taylor.  There was no response to that form. 127: Ex:6: Eccles Dep:

40-46; Ex:1: 125-26; Ex:1:116-122; 125-26; 129-30.

Jail Officer April Cummings was on the graveyard shift. 127:Ex:11 CummingsDep:14.

Her required presence at late night bookings and her employment evaluation precluded her from

doing the check on prisoners every 30 minutes. Id:30. She found India Taylor non-responsive in

her cell at 0330 Id:40.  Cummings notified Nurse Mattes at 0340: Ex:1:122. Nurse Mattes called

Dr. Johnson. He came to the Peoria County Jail, examined Taylor, and pronounced her dead at

0430.127:Ex:2.  Dr. Johnson then turned investigation of Taylor's death to the Sheriff's Department Crime Scene Technician and Detectives and the Coroner's pathologist. Id.

Dr. Johnson made no review of the conduct of the Nurse Defendants to determine if they had complied with the Advanced Correctional Health Care protocols and the accepted standard of care and whether any departures was a factor in India Taylor's death. 127:Ex:33-34. The Crime Scene Technician and Detectives do not have the expertise to make such a determination. The Coroner's pathologist, Brian Mitchell, M.D., performed an autopsy. He found the cause of death to be cardiovascular disease with a mechanism of cardiac arrhythmia. Dr. Mitchell did not have the expertise to determine if the lack of medications had any role on Taylor's death. That would have to be done by an internist or family physician. 127:Ex:12:MitchellDep:22-26.

Sheriff McCoy is the chief law enforcement officer for Peoria County.127: Ex:15: 4, 6. Superintendent Steve Smith is responsible for management of the operation of the Peoria County Jail. 127:Ex:McCoyDep:15:8, 12. McCoy and Smith confer on matters of the day, but Smith has the day to day responsibility for the Jail.  Id: 8, 12.

Jail Officers Eccles and Brownell prepared Incident Reports of Nurse Hibbert and Nurse Mattes' refusal to examine Taylor when she was vomiting and undergoing heroin withdrawal. Ex:1:124-25; 129-30. They were also interviewed about those events by the investigating officer, Detective Quest. 127:Ex:2:SmithDep:91-104.

The Jail Officers were vocal about the Nurses conduct blaming Nurse Patty [Mattus] for Taylor's death. 127:Ex:2: Smith Dep:91-104. Superintendent Smith had the Incident Reports prepared by Jail Officers Eccles and Brownell detailing the refusal to treat Taylor's vomiting and heroin withdrawal. Ex:1:124-25; 29-30. He also had the Jail Records showing Taylor's

4

prescriptions which were given in the July 17 and August 2, 2003 incarcerations of Taylor by the Nurse Defendants.  Ex:1:105; 108[July 17, 2003]; 109; 113 [August 2, 2003]. The October 15, 2003 Jail Records showed those prescriptions were never filled. Ex:1:114-123.

Dr. Johnson heard of the Jail Officers' complaints of the Nurse Defendants' role in India Taylor's death.  He went to Superintendent Smith to complain. 127:Ex:2 Smith Dep:98-102. Smith knew the deficiencies in the delivery of medical care to India Taylor from Eccles and Brownell's Incident Reports and the Jail records.  Smith prepared an e-mail to the Jail Officers informing them that India Taylor had made the choices and was responsible for her own death. He ordered the Jail Officers to cease any talk of the Nurses causing her death. 127: Ex:2 Smith Dep: 98-104; Ex:8.

Deaths in Illinois County Jails are reviewed by the Illinois Department of Corrections. 127: Ex:2: SmithDep: 105. The report of the review found deficiencies in the Jail's conduct in the death of India Taylor.Id:105-107.  Smith testified the report found he they had not documented their 30 minute required checks. Id:106.Jail Officer Cummings – who had to attend to bookings and an evaluation – did not observe the inmates including India Taylor every 30 minutes as required by state regulation.127:Ex:11 CummingsDep:14, 30. Smith did not know of this in his follow up to the Department of Corrections review. 127:Ex:2:SmithDep:105-07.

Plaintiff has asserted a Section 1983 claims against Sheriff McCoy and Superintendent Smith. He claims the Sheriff and Superintendent were deliberately indifferent to the denial of necessary medical care to prisoners by Advanced Correctional Health Care.  He also asserts a denial of the right of access to the courts for the refusal of Sheriff McCoy and Superintendent Smith to preserve the key facts of wrongdoing in India Taylor's death.  Finally, plaintiff asserts

5

state common law claims of willful and wanton conduct against Sheriff McCoy and

Superintendent Smith.

## II.
## Statement of Material Facts

**A.    Undisputed Facts**

1.      Plaintiff admits these matters.

2.      Plaintiff admits these matters.

3.      Plaintiff admits these matters.

4.      Plaintiff admits these matters.

6.      Plaintiff admits these matters.

8.      Plaintiff admits these matters.

10.     Plaintiff admits these matters.

11.     Plaintiff admits these matters.

12.     Plaintiff admits these matters.

14.     Plaintiff admits these matters.

15.     Plaintiff admits and states Jail Officer Brownell went through this process with

India Taylor. 127: Ex:5:BrownellDep:16-18.

16.     Plaintiff admits this matter.

18.     Plaintiff admits this matter.

19.     Plaintiff admits this matter.

21.     Plaintiff admits this matter.

22.     Plaintiff admits this matter.

23.     Plaintiff admits this matter.

26.     Plaintiff admits this matter.

27.     Plaintiff admits this matter.

30.     Plaintiff admits this matter.

31.     Plaintiff admits this matter.

32.     Plaintiff admits this matter.

34.     Plaintiff admits this matter.

35.     Plaintiff admits this matter.

36.     Plaintiff admits this matter.

37.     Plaintiff admits this matter.

38.     Plaintif admits this matter.

39.     Plaintiff admits this matter.

40.     Plaintiff admits this matter.

41.     Plaintiff admits this matter.

42-44.  Plaintiff admits these matters, except that Jail Officer Cummings made the call to

Nurse Mattes at 0340. Ex:1:122.

45.     Plaintiff admits this matter.

46.     Plaintiff admits this matter.

50.     Plaintiff admits this matter.

51.     Plaintiff admits this matter.

52.     Plaintiff admits this matter.

53.     Plaintiff admits this matter.

54.      Plaintiff admits this matter.

56.      Plaintiff admits this matter.

57.      Plaintiff admits this matter.

58.      Plaintiff admits this matter.

60.      Plaintiff admits this matter.

61.      Plaintiff admits this matter.

62.      Plaintiff admits this matter.

63.      Plaintiff admits this matter.

64.      Plaintiff admits this matter.

66.      Plaintiff admits this matter.

72.      Plaintiff admits this matter.

73.      Plaintiff admits this matter.

78.      Plaintiff admits this matter.

**B.      Fact Admitted, But Not Material**

25.      Plaintiff admits Jail Officers Brownell and Eccles testified that the vomit did not

appear to be a large amount, but the amount of vomit for a patient undergoing heroin withdrawal

on diuretic medications with cardiomyoathy is not addressed in this paragraph. The materiality of

this observation remains for the physicians.

**C.      Disputed Material Facts**

5.      Plaintiff admits that is part of the protocol, but denies it is the complete potion

applicable here. The protocols require the nurse to arrange for a physician examination for

patients complaining of chest pain. 127:Ex:1:JohnsonDep:22-23. Ex:2.  Patients undergoing

heroin withdrawal also require a physician examination. 127:Ex:1 JohnsonDep:53-54; Ex:2.

7.      Plaintiff admits Dr. Johnson prescribe medications, but denies it is complete.

When the nurses were informed the patient had prescriptions they are to call Dr. Johnson.

126:PartII:Advanced Health Care Motion; Statement of Facts:¶ 62; Plaintiff admitted this.

142:PartII:¶ 62:7.

9.      Plaintiff admits these matters, but denies it is complete.  Although Jail Officers do

deliver documents the Nurses place into the medical record like Sick Call Request Forms, which

was done with the form prepared for India Taylor on October 16, 2003 at 1740.

127:Ex;6:EcclesDep:45-56.

13.      Plaintiff admits this matter, but denies it is complete. The assessment include the

diuretic and hypertension medications Taylor was on, Amaryl (mistakenly referred to as Demerol

[127:Ex:22:MoultonDep:43-44), Tylenol 3, Exmeril, Diamoxin, Lacix, and Coreg. Ex:1:109.

14.      Plaintiff admits this matter, but states the medications listed by Brownell were

Diamox, Lacix, etc.. Ex:1:114.

20.      Plaintiff admits this matter, but denies it is complete. It does not mention

Radcliff's failure to arrange for a physician examination of Taylor's chest pain as required by the

Advanced Correctional Health Care protocol. 127:Ex:1:JohnsonDep:22-23. Ex:2.

28.      Plaintiff denies this accurately states the conversation between Nurse Hibbert and

Jail Officer Eccles.  Eccles informed Nurse Hibbert of the vomiting, the belief of Jail Officer

Brownell and her (Eccles) that Taylor was in heroin withdrawal and asked Hibbert to see Taylor.

Hibbert stated she would not see Taylor and told Eccles to put her on a Sick Call Request Form

and the nurse on duty at the next shift which started at 20:00 hours could see her. 127:Ex:6: Eccles Dep:30-36; Ex:1:125-26.

29.     Plaintiff denies this accurately states what occurred. Jail Officers Brownell and Eccles completed a Sick Call Request Form for Taylor with her at the cell at 17:40, which is 5:40 p.m. Jail Officer Eccles submitted the Sick Call Request Form in the box Intake Area for Nurse Hibbert. The Sick Call Request Form is not in the Jail Records or medical records. 127: Ex:6: EcclesDep: 40-46; Ex:1: 125-26; Ex:1:116-122.

47.     Plaintiff admits this testimony was made, but denies it accurately states the material circumstances. Amanda Eccles testified that the three and half to four hours Nurse Hibbert gave them for the nurse on the 20:00 shift to see Taylor was an awfully long time. 127:Ecclees Dep:42-43.

48.     Plaintiff admits, but there have been two deaths after Taylor's death. Plaintiff has not sought evidence from those incidents for use in this action.

49.     Plaintiff admits, but states it provides no means for command intervention to address whether necessary medical are is withheld. Jail Officers Eccles and Brownell prepared such confidential reports after Taylor died. Ex:1:124-25; 129-30. Jail Officers were complaining that the Nurse caused India Taylor's death. 127:Ex:2: SmithDep:94-104. Dr. Johnson heard of the Jail Officers' complaints of the Nurse Defendants' role in India Taylor's death. He went to Superintendent Smith to complain. Smith knowing the deficiencies in the delivery of medical care to India Taylor prepared an e-mail to the Jail Officers informing them that India Taylor had made the choices and was responsible for her own death. He ordered the Jail Officers to cease any talk of the Nurses causing her death. Ex:8.

10

55.     Plaintiff admits this matter. While the Sheriff has final approval, the Sheriff's policies are approved by everyone in the command center. 127:Ex: 15: McCoyDep:30. Sheriff McCoy relies on Superintendent Smith for the day to day management of the Jail. Id:12.

59     Plaintiff admits Superintendent Smith testified to this, but denies Superintendent Smith could rely on Dr. Johnson' assurances of compliance with "proper medical procedures and protocols" and "see what we should have been doing to treat her" was sufficient to answer those questions.

A.      Superintendent Smith was not a physician, but he knew from the Incident Reports of Jail Officers Brownell and Eccles reporting on Nurse Pam Hibbert's refusal to treat India Taylor for the vomiting and heroin addiction. Ex:1:124-25; 129-30.

B.      Medical knowledge is not required to conclude that the Jail Officers request for an examination and the follow up Sick Call Request Form completed by Brownell and Eccles for Taylor should have resulted in an examination.

C.      One does not need medical knowledge to look at the October 15, 2003 records of India Taylor's incarceration, compare them with those of the July 17 & August 2, 2003 incarcerations and observe the following:

(1)     The October 15, 2003 Intake Screening Form listed prescriptions Those prescriptions were not given to Taylor. Ex:1:114-22.

(2)     A comparison of the records for that admission with those of the July 17 and August 2, 2003 admissions showed the prescriptions listed were given during those incarcerations. Ex:1:104-05, 108; 109, 113.

(3)     The July 17, 2003 incarceration showed Taylor undergoing heroin withdrawal. A liquid diet was prescribed. Ex:106-07.

(4)     Heroin withdrawal by Taylor was the condition which lead Jail Officers Brownell and Eccles to seek Nurse Hibber's examination of Taylor on October 16, 2003. 127:Ex:6: Eccles Dep:30-36; Ex:1:125-26; 129-30.

11

    (5)      The Sick Call Request Form was completed at 17:40 on October 16, 2003.  127: Ex:6: EcclesDep: 40-46; Ex:1: 125-26; 129-30.

    (6)      Taylor was never examined until April Cummings found her non-responsive in her cell at 0330. Ex:1:116-122.

    D.      This information would have lead to a telephone call to the Coroner's physician Dr. Mitchell to determine if the lack of medications could have been a factor in Taylor's death. That telephone call would have alerted Smith to the fact that those questions would have to be answered by a clinical physician. 127:Ex:12: MitchellDep:22-26.

    E.      Smith also knew of the complaints of the Jail Officers that the Nurse was responsible for Taylor's death. When Dr. Johnson complained, Smith did not ask him about the prescriptions that were not filled and the non-response to the Jail Officers' request to Nurse Hibbert to examine Taylor for heroin withdrawal.  Instead, Smith followed Johnson's complaint and sent the e-mail attributing Taylor's death to her own choices and directing the Jail Officers to refrain from further comment about the Nurses' role in Taylor's death. 127:Ex:2:SmithDep:92-104;Ex:8.

65.    Plaintiff denies this matter. Taylor received a prescription from Dr. Prohaska on July 17, 2003,  which is contained in the Peoria County Jail Records. Ex:1:104. It was given to her during that incarceration. Ex:1:108.  Taylor was also given prescriptions during her August 2-28, 2003 incarceration at the Jail. Ex:1:109;113.  The Walgreen's records do not show the October 15, 2003 paper prescription are are not reliable. 127:Ex:20.; Ex:18-29. It does not also include any sample prescriptions Dr. Bowman provided Taylor, who died on November 2, 2004. Ex:6. The State's Attorney sent an investigator to locate Dr. Bowman's records, but was unable to obtain those records.[2]

67,    Plaintiff admits Dr. Moulton testified in this manner, but denies it is material. The October 15, 2003 chest pain complaint is significant because it required a physician examination

---

[2] This is the recollection of plaintiff's counsel. He has asked defense counsel to respond by confirming it or explaining what records were obtained.

under the Advanced Correctional Health Care protocols. 127: Ex:1: Johnson Dep:22-23; Ex:2.

That examination would have revealed an electrolyte balance and may well have lead to an

electrocardiogram which could have shown signs of arrhythmia. Ex:4: WeinsteinDec:¶ 14E: 11-

12. Dr.Moulton agrees that chest pain requires an exam for cardiac problems. 127:Ex:22:

MoultonDep:46.

68.     Plaintiff admits, but denies it is complete. Had Taylor been placed on observation

at the Jail or in a hospital as her condition of cardiomyopathy, diuretic and hyptertension

medication, vomiting with possible heroin withdrawal may have warranted, she would have been

under observation where a defibrillator would have been available and could have prevented her

death even accepting Dr. Moulton's opinion of the mechanism of death. 127:Ex:22:

MoultonDep:53-54 (a portable defibrillator while Taylor was under observation would likely

have saved her). The Peoria County Jail had a portable defibrillator. Ex:9:KennedyDep:9.

69.     Plaintiff admits Dr. Moulton testified to this, but denies it is true. Vomiting in

combination with diuretic medication can deplete the body of potassium in the blood which cases

acidosis in the blood and arrhythmia from the potassium deficiency which affect the function of

heart pacemaker cells that control the electrical impulses of the heart. Ex:4:Weinstein Dec: ¶

21:14.  Taylor died of an arrhythmia, which Dr. Moulton testified is caused by an electrolyte

imbalance. Ex:127: Ex:22 Moulton Dep: 69. Dr. Moulton also testified that the specific nurse's

notes on vomiting are unclear. The Nurse (Mattes) used "emesis", the medical term for vomit –

which is a verb – as a noun. Id:74. The nurse did not understand the language she was using and

there was conflicting commentary, which makes it unclear. Id:74-75.

70.     Plaintiff admits that is Dr. Moulton's opinion, but denies it is true. Dr.Weinstein is of the opinion that the departures from the accepted standard of care identified in ¶ 13 of his Declaration, and the conduct of Dr. Johnson in not supervising the nursing staff was a cause of India Taylor's death. Ex:4:¶ 13-14. Dr. Weinstein is of the opinion that Taylor's cardiomyopathy, the intake of powerful diuretic medications, her weakened heart muscle from cardiomyopathy, put her at a significant risk for arrhythmia. The vomiting observed by the nurses lead to an electrolyte imbalance that resulted in the arrhythmia that lead to Taylor's death. Ex:4:¶ 14D:10-11; 21:14.

71.     Plaintiff admits that is Dr.Moulton's opinion, but denies the departures from the standard of care by the nurses and Dr. Johnson were not a cause and states the cause of that mechanism Dr. Moulton describes is an electrolyte imbalance. Ex:4:¶ 13-14. Dr. Weinstein is of the opinion that Taylor's cardiomyopathy, the intake of powerful diuretic medications, her weakened heart muscle from cardiomyopathy, put her at a significant risk for arrhythmia. The vomiting observed by the nurses lead to an electrolyte imbalance that resulted in the arrhythmia that lead to Taylor's death. Ex:4:¶ 14D:10-11; 21:14.

74.     Plaintiff admits this matter, but denies it prevented Taylor from being saved had the nurses and Dr. Johnson complied with the accepted standard of care. Had the examination been performed, Taylor could have been placed in observation in a hospital or at the Peoria County Jail where a portable defibrillator was available.Ex:9:KennedyDep:9.  Nurses observing Taylor would have seen the arrhythmia and put her on the defibrillator which would likely have saved her. 127:Ex:22: MoultonDep:53-54.

75.     Plaintiff admits, but denies that Dr. Weinstein did not have available the prescription records of the July 17-18 & August 2-28 incarcerations and those given on discharge from Methodist Medical Center on May 4, 2003. What Dr. Weinstein testified about was that he did not remember Dr. Schmidt's prescriptions and would have to look at the record.  When directed to the paper prescriptions, Dr. Weinstein referred to them..  The Jail Records containing the medical records and prescriptions were available, but Dr. Weinstein was not questioned about those. Ex:5:WeinsteinDep: 40, 54.

76.     Plaintiff admits Dr. Weinstein did not have the expertise at the time of his deposition to testify on which of the possible mechanisms of Taylor's death were most likely. Ex:5:WeinsteinDep:39-40; 24-40. Now that Dr. Weinstein has the opinion of the defense cardioelectrophysiologist, he can testify the likely mechanism of death was an electrolyte imbalance with hypkalemia (low potassium levels) resulting in arrhythmia.. Ex:4:WeinsteinDec:¶ 11:5-6;¶ 14D:10-12. Plaintiff incorporates his answer to ¶ 106-108 of his response to those paragraphs of the Advanced Correctional Health Care Statement of Undisputed Facts. 142:Part II C:16, which are repeated below.

> 106.     Plaintiff admits this matter except that the reference to cause in Dr. Weinstein's opinion is to the mechanism of her death.  Now that there is an opinion from a cardiologist ruling out the other possible mechanisms of Taylor's death identified by Dr. Weinstein in his deposition, Dr. Weinstein is of the opinion the mechanism of death was cardiac arrhythmia due to an electrolyte imbalance form the diuretics, her vomiting, and the departures from the standard of care by the Advanced Correctional Health Care nurses. Ex:4:WeinsteinDec: ¶14D:10.

> 107.     Plaintiff admit that is Dr. Moulton's opinion, but denies it is conclusive.  Dr. Weinstein states it is unknown whether Taylor died in her sleep or had awoken.  This can not be determined because she was untreated and unobserved at the time of her death. Ex:5: WeinsteinDep:24.

108.     Plaintiff admits that is Dr. Moulton's opinion, but states Dr. Weinstein's opinion is the mechanism of death was cardiac arrhythmia from an electrolyte imbalance with hypokalemia (low potassium levels).  Her congestive heart failure and sophisticated diuretic and anti-hypertension medication would have alerted nurses applying the accepted standard of care that India Taylor required treatment.  The Advanced Correctional Health Care nurses did this in the July 17 and August 2, 2003 incarcerations, but did not in the October 15-17, 2003 incarceration of India Taylor. Ex:4:WeinsteinDec:¶ 11;5-6; ¶ 14D:10-12.

77.     Plaintiff admits this, but denies it applies to the present case. Dr. Weinstein's experience in correctional medicine gives him the expertise to identify the departures from the standard of care present here and their causal effect.  The question of whether an electrolyte imbalance was the mechanism of that death or whether it was sudden arrythmia as Dr. Moulton opines, is based on a evaluation of the data contained in the Jail Medical Records and incomplete report of vomiting and prescription usage. Ex:4: WeinsteinDec:¶ 13&14:7-12.

79.     Plaintiff admits Dr. Moulton testified to this, but denies it is true. It is based upon an evaluation of the diuretic medication use, the extent of the vomiting which is unclear from the nurse's description and the effect on Taylor's weakened heart from the cardiomyopathy. Dr. Weinstein is of the opinion that Taylor's cardiomyopathy, the intake of powerful diuretic medications, her weakened heart muscle from cardiomyopathy, put her at a significant risk for arrhythmia. The vomiting observed by the nurses lead to an electrolyte imbalance that resulted in the arrhythmia that lead to Taylor's death. Ex:4:¶ 14D:10-11; 21:14.

80.     Plaintiff admits Dr. Moulton testified to this, but denies it accurately states his testimony. Dr. Moulton testified it is probably true that an intermittent use of the diuretic medication probably has an effect, but quantifying it is the problem. 127:Ex:22: MoultonDep:57.

16

81.     Plaintiff admits Dr. Moulton states this, but denies it is true.  Plaintiff denies that Dr. Moulton who has no expertise in correctional medicine is competent to give an opinion. 127: Ex:22: Moulton Dep:15. Jail Officers Brownell and Eccles knew that vomiting and heroin withdrawal required examination by a nurse. 127:Ex:6: Eccles Dep:30-36, 40-46; Ex:1:125-26; 129-30. Dr. Weinstein who has 32 years experience in correctional medicine testified that Jail Officers are much more sophisticated than those without medical training in recognizing medical conditions. Ex:4:15;Ex:5:WeinsteinDep:82.

82.     Plaintiff admits Dr.Moulton testified to that, but denies it is true  Dr. Mitchell, the Coroner's physician, testified he did not have the expertise to give an opinion on whether the failure to give Taylor her medications contributed to her death as that would require the involvement of a clinical physician.127:Ex:12: MitchellDep:22-26.

1.      Had Dr. Johnson reviewed the chart when he pronounced Taylor dead on October 17, 2003 or on hearing the complaints of the Jail Officers instead of going to Superintendent Smith to silence those complaints, the extent of the vomiting would have been determined from Nurse Mattus. 127: Ex:1: Johnson Dep:32-36; 127:Ex:2:SmithDep:99-100.

2.      Had Dr. Johnson interviewed Jail Officers Eccles and Brownell instead of enlisting Superintendent Smith to silence them, there would be a record of the extent of vomiting they observed.   The vomit itself had been placed in a garbage bag for Nurse Hibbert. It may have been available. Ex: 1 125-26; 129-30; 127:Ex:2: JohnsonDep:32-36;  127:Ex:2: SmithDep:91-104.

3.      India Taylor's medication use is unclear.

A.      The Walgreen's prescription records contain a material omission of the October 15, 2003 paper prescriptions, which undermines the integrity of the Walgreen's records. 127:Ex:20.

17

    B.    Had Dr. Johnson done his duty, this discrepancy would have been resolved. An interview with the family and search of her residence for prescription documents would have provided a complete record of her prescriptions from pharmacy.

    C.    Dr. Bowman, Taylor's treating physician, died on November 2, 2004. Ex:6. He was available to discuss his records and determine if any sample prescriptions or other pharmacy were used by Taylor to obtain those prescriptions.

**D.    Statement of Additional Material Facts**

1-61.  Plaintiff's statement of Additional Material Facts is adequately set forth in Plaintiff's Response to Motion for Summary Judgment of Defendant, Advanced Correctional Health Care, Inc. 142:PartIID:21-31. That statement is incorporated by reference here.

62.  Superintendent Smith knew of the following matters that required his inquiry to determine if India Taylor's death was caused by a denial of necessary medical care.

    A.    Superintendent Smith was not a physician, but he knew from the Incident Reports of Jail Officers Brownell and Eccles reporting on Nurse Pam Hibbert's refusal to treat India Taylor for the vomiting and heroin addiction. Ex:1:124-25; 129-30.

    B.    Medical knowledge is not required to conclude that the Jail Officers request for an examination and the follow up Sick Call Request Form completed by Brownell and Eccles for Taylor should have resulted in an examination.

    C.    One does not need medical knowledge to look at the October 15, 2003 records of India Taylor's incarceration, compare them with those of the July 17 & August 2, 2003 incarcerations and observe the following:

        (1)    The October 15, 2003 Intake Screening Form listed prescriptions Those prescriptions were not given to Taylor. Ex:1:114-22.

18

(2)     A comparison of the records for that admission with those of the July 17 and August 2, 2003 admissions showed the prescriptions listed were given during those incarcerations. Ex:1:104-05, 108; 109, 113.

(3)     The July 17, 2003 incarceration showed Taylor undergoing heroin withdrawal. A liquid diet was prescribed. Ex:106-07.

(4)     Heroin withdrawal by Taylor was the condition which lead Jail Officers Brownell and Eccles to seek Nurse Hibber's examination of Taylor on October 16, 2003. 127:Ex:6: Eccles Dep:30-36; Ex:1:125-26; 129-30.

(5)     The Sick Call Request Form was completed at 17:40 on October 16, 2003.  127: Ex:6: EcclesDep: 40-46; Ex:1: 125-26; 129-30.

(6)     Taylor was never examined until April Cummings found her non-responsive in her cell at 0330. Ex:1:116-122.

D.      This information would have lead to a telephone call to the Coroner's physician Dr. Mitchell to determine if the lack of medications could have been a factor in Taylor's death. That telephone call would have alerted Smith to the fact that those questions would have to be answered by a clinical physician. 127:Ex:12: MitchellDep:22-26.

E.      Smith also knew of the complaints of the Jail Officers that the Nurse was responsible for Taylor's death. When Dr. Johnson complained, Smith did not ask him about the prescriptions that were not filled and the non-response to the Jail Officers' request to Nurse Hibbert to examine Taylor for heroin withdrawal.  Instead, Smith followed Johnson's complaint and sent the e-mail attributing Taylor's death to her own choices and directing the Jail Officers to refrain from further comment about the Nurses' role in Taylor's death. 127:Ex:2:SmithDep:92-104;Ex:8.

## III.
## Applicable Law

**A.      Dismissal of Jail Officers**

The claims for denial of necessary medical care and wilful and wanton conduct against

the Jail Officers, Amanda Eccles, Melinda Brownell, and April Cummings, have been dismissed.

19

148; August 6, 2007 Order. That eliminates Parts C 2 of the Argument of Sheriff McCoy and Superintendent Smith. 127:18-22. The remaining claims are against Sheriff McCoy and Superintendent Smith.

### B.     The Burden of the Summary Judgment Movant

"An unfortunately common error" in summary judgment is that the initial burden of the summary judgment movant is ignored *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996) citing *Russ v. International Paper Co.*, 943 F.2d 589, 591-93 (5th Cir.1991) (per curiam); *Clark v. Coats & Clark, Inc*., 929 F.2d 604, 606-09 (11th Cir.1991). The movant must articulate with references to the record and the law the reason why there is no genuine issue of material fact. If the movant does not satisfy its initial burden, the court must deny the motion for summary judgment without consideration of the non-movant's response. *Logan*, 96 F.3d at 979 citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).

### C.     Illinois Sheriffs and Their Policy Making Agents

In Illinois, the Sheriff is an independently elected constitutional officer.  Ill.Const. 1970, Art. 7, § 4 (a). The Sheriff has final policy making authority over the County Jail. *DeGenova v. Sheriff of DuPage County*, 209 F.3d 973, 976 (7th Cir. 2000). He has no Eleventh Amendment immunity because he is acting as a county officer in the conduct of the Jail. Id.

A local governmental entity or official is liable under Section 1983 only for acts that are its custom or policy. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 691, 98 S.Ct. 2036 (1978). *Monell* requires Section 1983 liability be based on an action of the governmental entity that was policy adopted by the agent with policy making authority under state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123,108 S.Ct. 915 (1988)(plurality).

The identity of the policy making agent of the governmental entity for *Monell* liability is informed by state law, although its labels are not controlling.  *McMillian v. Monroe County, Alabama*, 520 U.S. 781, 786,  117 S.Ct. 1734 (1997).  The delegation of  policy making authority by the official charged with that authority to his subordinate makes the subordinate the policy making agent of the entity. *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292 (1986) (Assistant County Attorney who advised Sheriff's deputies to illegally enter and search the plaintiff's office was the policy making agent of Hamilton County, Ohio because he was exercising the County Attorney's authority). The delegation of policy making authority may occur formally, but is usually proven by a custom of delegation of policy making authority. *Kujawski v. Board of Com'rs of Bartholomew County, Indiana*, 183 F.3d 734, 737 (7th Cir. 1999)

### D. A Wrongdoer May Not Avoid Liability by the Uncertainty in Ascertaining Causation and Damages its Wrong Created

The analogous rules of the common law of torts govern the causation and damage elements of the Section 1983 claim. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473 (1961)(Section 1983 is to be read against the tort principle that a man is responsible for the natural consequences of his actions); *Carey v. Piphus*, 435 U.S. 247, 257-58, 98 S.Ct. 1042 (1978)(damages are determined under Section 1983 by the common law tort principle of compensation for injuries caused by violation of his legal rights).

The common law principle that a wrongdoer bears the risk of the uncertainty in the ascertainment of causation and damages his wrong created is a part of federal law. *Bigelow v. R.K.O. Pictures, Inc.*, 327 U.S. 251, 255, 66 S.Ct. 574 (1946)(antitrust case); *Zinnel v. U.S. Shipping Board*, 10 F.2d 47, 49 (2d Cir. 1925)(admiralty case). One who undertakes to provide services for the protection of others is liable if his negligence increases the risk of harm and that

21

risk of harm is a substantial factor in bring about the result. Restatement of Torts (Second) §§

323; 324A (1965); *Hamil v. Bashline*, 481 Pa 256, 392 A.2d 1280, 1287 (1978); *Houlton v.*

*Memorial Hospital*, 176 Ill.2d 95, 119, 679 N.E.2d 1202, 1213 (1997).

      The Seventh Circuit has applied these proximate cause principles in Section 1983 cases

for the denial of necessary medical care. *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1184 (7th

Cir. 1985); *Archie v. Racine*, 826 F.2d 480, 498-99 (7th Cir. 1987) *rev'd on other grounds* 847

F.2d 1211 (7th Cir. 1988)(en banc).  Plaintiff's Response to Defendants' Motion to Exclude

Plaintiff's Expert Witness discusses these principles fully. 137:PartIIA:17-19.

    **E.**    **The Standard of Liability for Jail Non-Professionals for Denial of Necessary Medical Care to a Detainee**

      **1.**    **Application of the Subjective Deliberate Indifference Standard of the Eighth Amendment to a Detainee has No Basis in the Substantive Due Process Right to Necessary Medical Care Guaranteed by the Fourteenth Amendment**

      Plaintiff has discussed the incongruity of the present Seventh Circuit position that the

right of pre-trial detainees to necessary medical care under substantive due process of the

Fourteenth Amendment is determined by the standard applied to convicts asserting a denial of

necessary medical care is cruel and unusual punishment contrary to the Eighth Amendment. He

asserts that position here, but refers to plaintiff's response to the Advanced Correctional Health

Care motion for summary judgment. 142:PartIIIC3:39-42.

      **2.**    **The Deliberate Indifference Standard of Denial of Necessary Medical Care Presently Applied**

      The Seventh Circuit has applied the Eighth Amendment standard to detainee's claims

against prison officials and professionals for denial of necessary medical care to detainees.

*Salazar v. City of Chicago*, 940 F.2d 233, 239 (7th Cir. 1991). The elements of the claim against

the prison official are (1) the plaintiff's need was serious under an objective standard, (2) the defendant jail official knew or was deliberately indifferent to that risk, and (3) the defendant disregarded the need for medical care. *Chavez v. Cady*, 207 F.3d 901, 905 (7th Cir. 2000).

Prison officials are not medical professionals, so the determination of need for medical care must be made on the basis of what the prison official would know. Id at 905.  A prison official will not have the knowledge of a medical professional, but he will have more knowledge than that a lay person.  Proof of the knowledge element of deliberate indifference may be made by the fact the medical need was obvious. *Farmer v. Brennan* 511 U.S. 825, 842, 114 S.Ct. 1970 (1994).

A supervisor is personally responsible for the constitutional deprivations of his subordinates under Section 1983 if he encourages, facilitates, approves, condones, or a turns a blind eye to them. *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). In other words, the supervisor just" doesn't give a damn" about whether or not his subordinates are depriving people of constitutional rights. *Bordanaro v. McLeod*, 871 F.2d 1151, 1164 (1st Cir. 1989) quoted at 142:PartIVB1:45-46. A supervisor or one directly involved with the prisoner acts with deliberate indifference when he knows of a substantial risk to inmates that he could easily have prevented, but does not. *Hall v. Bennett*, 379 F.3d 462, 464 (7th Cir. 2004). Knowledge can be inferred from the very fact the risk was obvious. Id at 464.

The supervisor need not know of precise harm to the particular plaintiff. It is enough that he know of the substantial *risk* of serious harm to the prisoner or prisoners generally. *Kahle v. Leonard*, 477 F.3d 544, 550-51 (8th Cir. 2007)(holding fact that Deputy Sheriff knew of the officer's visits to the female inmate's cell three times after lockdown and was in the cell one of

23

those times for at least five minutes established triable issue of fact on the Deputy's deliberate indifference to the sexual assault of the inmate by the officer).

### 3. Deliberate Indifference and a Policy of Deliberate Indifference May be Proven by Conduct After the Event at Issue Including the Response to the Incident Itself

Evidence of the response to the occurrence and events occurring thereafter is sufficient to prove deliberate indifference or the existence of a policy of deliberate indifference. *Henry v. County of Shasta*, 132 F.2d 512, 519 (9th Cir. 1997); *Foley v. City of Lowell, Massachusetts*, 948 F.2d 10, 14 (1st Cir. 1991); *Bordanaro v. McLeod*, 871 F.2d at 1166-67 (1st Cir. 1989). The Seventh Circuit panel affirmed admission of evidence of a separate action brought against the police officer upheld despite the fact the incident occurred one month after the event involved in the action before the court. *Sherrod v. Berry*, 827 F.2d 195, 204-05 (7th Cir.1987). The en banc court vacated on the other ground of error in the admission of the fact the deceased did not have a gun overcame its probitive value on issue of whether defendant police officer who shot him reasonably believed he had a gun. *Sherrod v. Berry*, 835 F.2d 1222 (7th Cir. 1987). The court remanded the case for a new trial where evidence of the incident occurring one month later was admitted and evidence of the fact the deceased did not have a gun was not. *Sherrod v. Berry*, 856 F.2d 802 (7th Cir.1988) (en banc).

### IV.
### Argument

### A. There is a Triable Issue of Fact on Whether the Departures from the Advanced Correctional Health Care Protocols and the Accepted Standard of Care Identified by Dr. Weinstein are a Proximate Cause of the Increased Risk That Was a Substantial Factor in India Taylor's Death

This responds to Part C 3 of Defendants' Argument. 127:Part C: 22-26.

1.    Sheriff  McCoy and Superintendent Smith say there is insufficient evidence that India Taylor took her sophisticated regimen of diuretics and hypertension medication to support Dr. Weinstein's opinion that it was a factor in her death. 127:22-23; Ex:5:WeinsteinDep: 34-35. There are gaps in the prescription records.

(A)The Walgreen's prescription records – which defendants accept as complete – do not include Taylor's October 15, 2003 prescriptions. 127:Ex:18-19; 20.  That undermines the integrity of the records offered by defendant and makes it a question of fact on what other prescriptions are missing. Compare Ex:19 with Ex:20.

(B) Dr. Bowman was India Taylor's treating physician. He died on November 4, 2004. Ex:6.  His records are unavailable, so we do not know the amount of sample medications he gave Taylor. Dr. Schmidt, the cardiologist, testified to the practice of giving sample medications to those who can not afford them.127:Ex: 17: Schmidt Dep:27. Nor do we know if pharmacies other than Walgreen's may have supplied prescriptions Taylor obtained from Dr. Bowman. The jury to determine if Taylor was without her diuretics for 52 days from June 2- July 23, 2003 and September 19-October 14, 2003. The unfilled paper prescription receipts of October 15, 2005 state no refills. Ex:20.

Even if we accept defendants' contention on prescription usage, it does not eliminate Dr. Weinstein's opinion from summary judgment. Dr. Moulton testified intermittent use of diuretic medications probably benefit the patient, but it can not be quantified. 127:Ex:22; MoultonDep: 57.  The effect of diuretic usage from June 2- July 23, 2003 and September 19-October 14, 2003 – the period defendants say Taylor did not have the medications – is not particularly relevant to whether an electrolyte imbalance in which diuretics played a role occurred on October 15-17,

25

2003. The jury is free to use their common sense to conclude the diuretic usage at that time would have nothing to do with causing an electrolyte imbalance during Taylor's October 15-17, 2003 incarceration. Taylor was vomiting during that time; the nurses notes are unclear on the amount. 127:Ex:22; MoultonDep:74-75.

Elimination of diuretic usage still does not preclude a patient with severe cardiomyopathy undergoing vomiting and heroin withdrawal would not suffer an electrolyte imbalance sufficient to trigger cardiac arrhythmia. The diuretics were not used during Taylor's July 17-18, 2003 incarceration. She underwent heroin withdrawal. The nurses placed her on a liquid diet. Ex:1:107. That was to prevent dehydration and depletion of the electrolytes.

2.      Sheriff McCoy and Superintendent Smith say Dr. Moulton's opinions on the mechanism of Taylor's death are conclusive on summary judgment. Dr. Moulton who is a specialist in cardioelectrophysiology, knows nothing of correctional medicine. 127:Ex:22: MoultonDep:6, 15. Dr. Weinstein who has 34 years experience in correctional medicine is not a cardiologist. Patients who present in his general practice who have cardiology problems are referred to a cardiologist  Ex:4:WeinsteinDec:¶ 15. Ex:5: WeinsteinDep:39-40.

The determinative issue in this case is whether Taylor was denied necessary medical care and whether that denial was a cause of her death.  Dr. Moulton's expertise is limited to identifying the mechanism of death. He disclaims any knowledge of departures from the standard of care and their role in Taylor's death. 127:23-2. Dr. Weinstein's identification of the departures form the accepted standard of care, the increased risk from those departures, and their relationship to her death from cardiac arrhythmia establishes a triable issue of fact on the question of whether Taylor was denied necessary medical care that was a cause of her death.  See

Ex:4:WeinsteinDec:¶ 14 D:10-11.

The clinical physician provides the treatment required by the accepted standard of care to minimize the risk to the patient from the ongoing disease process. Id:¶14 F:12. "The law does not require and medicine can not provide such exactitude." *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1184 (7th Cir. 1985)(holding testimony that prison physician's denial of 10% to 30% chance of survival was sufficient to support the plaintiff's Section 1983 verdict for death of the inmate).

3.      The Sheriff and Superintendent also seize on Dr. Weinstein's candid acknowledgment at his deposition that without consultation with a cardiologist he does not have the expertise to give an opinion on the likely "cause" of death requires exclusion of his testimony. 127:24; Ex:5: WeinsteinDep:38-39. [3]  While the quoted question refers to "cause", the earlier questions leading up to that question on page 38 used the term "mechanism". This entire line of questioning began 14 pages earlier with a question on the mechanism of her death. Ex:5: WeinsteinDep:24.

Defendants have supplied the cardiologist opinion that Dr. Weinstein was lacking in his deposition. Ex:5:WeinsteinDep:38-39. Dr. Moulton did not mention the other possibilities identified by Dr. Weinstein of the mechanism of Taylor's death: (1) some other kind of acid base

---

[3] Plaintiff is repeating here the brief version of his earlier discussions of this matter in Plaintiff's Response to Defendants' Motion to Exclude Plaintiff's Expert Witness, 137: Part II C 2-5:7-14. He again discussed those opinions in Plaintiff's Response to the Advanced Correctional Health Care Motion for Summary Judgment. 142:PartIVD:48-50. He refers the court to those filings, which respond to the very same issue raised in the Defendants' Motion to Exclude Plaintiff's Expert Witness and the Advanced Health Care Motion for Summary Judgment. 121; 128.

imbalance that rendered her heart unable to function, (2) rapid death from acute congestive heart failure, (3) or a seizure from the electrolyte imbalance. Ex:5:WeinsteinDep:28.

That leaves an electrolyte imbalance, which Dr. Moulton concedes is a cause of arrhythmia. 127:Ex:22:MoultonDep:69. Dr. Weinstein is just as qualified as Dr. Moulton to interpret the reports of vomiting, her powerful diuretic medication, and heroin withdrawal and conclude the electrolyte imbalance lead to arrhythmia and death. Indeed, his correctional medicine background likely makes him more qualified, but that is for the jury.

The Seventh Circuit rejected a similar attempt by a defendant to exclude an expert's change of opinion based on additional information. *Jastremski v. United States*, 737 F.2d 666, 670 (7th Cir. 1984)(holding physician's father's earlier lack of suspicion of his newborn son's birth injury was not grounds for exclusion of his present opinion that the cerebral palsy diagnosed in his son was caused by birth trauma)

The admissibility of expert testimony is not a matter of the "semantics of a particular term or phrase." *Leckbee v. Continental Airlines, Inc.*, 410 F.2d 1191, 1194 (5th Cir. 1969)(physician's testimony based on history of pain from aborted take off and condition before and after the event was properly admitted); *Wood v. Stihl*, 705 F.2d 1101, 1107-08 (9th Cir. 1982)(reversing district court's exclusion of two expert witnesses in the dynamics of logging from testifying based on examination of scene afterward on what actually happened when the bowed leg broke and the plaintiff was injured by the chain saw); *Sentilles v. Inter-Carribean Shipping Corp.*, 361 U.S. 107, 109, 80 S.Ct. 173 (1959); ("The [jury's legal determination of cause] does not turn on the use of a particular form of words by the physicians giving their testimony."); *Nemir v. Mitsudishi Motors Corp.*, 381 F.3d 540, 554 (6th Cir. 2004). (reversing exclusion of expert's testimony that

28

the seat belt could be placed in a position of partial engagement by slightly depressing the release button or by improper or incomplete insertion holding the testimonywas sufficient even though it did not rule out all causes); *Nanda v. Ford Motor Company*, 509 F.2d 213, 221 (7th Cir. 1975) (holding experts often must determine causes by drawing inferences after the event from the available evidence; "It is enough that the expert opinion be supported by a rational explanation which reasonable men could accept as more probably correct than not correct.").

4. The fact Taylor was not seen for her complaints of chest pain as required by the Advanced Correctional Health Care Protocols for cardiac etiologies has no effect as she did not suffer a coronary artery spasm. 127:25; Ex:22 Moulton Dep: 88.  Once the physician examination was obtained – as it would have had Radcliff done what the accepted standard of care and the Advanced Correctional Health Car protocols requires — he would have followed the accepted standard of care and performed a complete examination. The likely would have alerted Dr. Johnson to the risk of electrolyte imbalance and cardiac arrhythmia. It would certainly have alerted him for the need to start the medications immediately without waiting on the family. Dr. Schmidt – the treating cardiologist testified to the substantial risk of death – 40%-50% -  from Taylor's congestive heart failure if unmedicated. 127:Ex:17:Schmdt Dep:28-32. Dr. Moulton concedes short term use of the diuretic and hypertensive medications would probably be beneficial.  127:Ex:22:MoultonDep:57

The Seventh Circuit has held evidence that a correctional health care provider does not follow orders, in that case for medications establishes deliberate indifference to a serious medical need. *Gil v. Reed*, 381 F.3d 649, 661-62 (7th Cir. 2004)(reversing summary judgment for physician's assistant).

The treatment protocol here is the same as the refusal to follow medication orders held sufficient proof of deliberate indifference in *Gil* and other cases. *Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001)(reversing dismissal of complaint finding refusal to give prescribed heart medications could be found to be a cause of a fluttering heart and chest pain)*;  Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir.1999) (reversing summary judgment for prison official who deliberately refused to administer prescribed pain medication). *Donald*, 95 F.3d at 555 (reversing dismissal of Eighth Amendment claim where prisoner alleged two-day deprivation of heart medication resulted in heart attack and hospitalization*).Donald v. Cook County Sheriff's Department*, 95 F.3d 548, 555 (7th Cir. 1996)(reversing dismissal of prisoner's complaint alleging two day deprivation of heart medication resulted in heart attack).

The proof that satisfies the deliberate indifference to Taylor's serious medical need also establishes a triable issue of fact that Radcliff disregarded that need by refusing to arrange for a physician examination and obtain Taylor's medications immediately. *Chavez*, 207 F.3d at 905.

**B.     There Are Triable Issues of Fact on the Official Capacity and Individual Capacity Claims Against Superintendent Smith**

This responds to Part C 4:26-30 and Part C 6:31-33. 127.

**1.     Sheriff McCoy Has Delegated the Policy Making Authority Over the Operation of the Jail to Superintendent Smith, So the Acts of Smith are the Acts of the Office of the Sheriff**

Plaintiff has asserted claims against Superintendent Smith in his individual capacity and his official capacity.  The official capacity claims are of the same legal effect as those asserted against Sheriff McCoy in his Official Capacity. *Kinkaid v. Rust*, 670 F.2d 737, 741 (7th Cir. 1982). The court held an Official Capacity claim against a Sheriff survives the occupant's death as it is the Office itself that has the liability and obligation to pay Section 1983 damages. Id citing

30

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018 (1978).

The delegation of policy making authority by the official charged with that authority to his subordinate makes the subordinate the policy making agent of the entity. *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292 (1986) (Assistant County Attorney who advised Sheriff's deputies to illegally enter and search the plaintiff's office was the policy making agent of Hamilton County, Ohio because he was exercising the County Attorney's authority). The delegation policy making authority may occur formally, but is usually proven by a custom of delegation of policy making authority. *Kujawski v. Board of Com'rs of Bartholomew County, Indiana*, 183 F.3d 734, 737 (7th Cir. 1999).

Here Sheriff McCoy is the chief law enforcement officer for Peoria County, Illinois. 127: Ex: McCoyDep:15:4, 6. While the Sheriff has final approval, the Sheriff's policies are approved by everyone in the command center. Id:30. Sheriff McCoy relies on Superintendent Smith for the day to day management of the Jail. Id:12. This is consistent with Superintendent Smith's conduct here. The results of the investigation were reported to Smith and he concluded there was no departure from the medical protocols that lead to India Taylor's death. 127: Ex:2: SmithDep:91-107. Smith reported that conclusion to Sheriff McCoy. Ex:8:691.

> **2.     Superintendent Smith Had a Policy of Deliberate Indifference to Denial of Necessary Medical Care to Prisoners Which Was a Moving Factor in the Deprivation of India Taylor's Right to Necessary Medical Care**

A supervisor who is aware of a "systemic lapse in enforcement of a policy" and does not enforce that policy is liable under Section 1983. *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998). Sheriff McCoy and Superintendent Smith say there is no evidence that they knew

31

anything about India Taylor before she died. 127:26.  But that is not the law. The supervisor need

not know of precise harm to the particular plaintiff. It is enough that he know of the substantial

*risk* of serious harm to the prisoner or prisoners generally. *Kahle v. Leonard*, 477 F.3d 544, 550-

51 (8th Cir. 2007).  Knowledge can be inferred from the very fact the risk was obvious. *Hall v.*

*Bennett*, 379 F.3d 462, 464 (7th Cir. 2004).

      Here there is a gap in the Sheriff and Superintendent's policies for providing medical care

at the Jail so wide that it allowed Taylor's death and puts other prisoners at substantial risk of

injury.  The Sheriff is the Warden of the Jail and the exclusive policy making official.  *DeGenova*

*v. Sheriff of DuPage County*, 209 F.3d 973, 976 (7th Cir. 2000).  He necessarily contracts with

physicians and nurses to provide necessary medical are to prisoners in the Jail.  But it is the

Sheriff's responsibility to see that his contractor's provide that necessary medical care.  This is

not an onerous responsibility as the individual Jail Officers are quite capable of reporting failure

of the Advanced Correctional Health Care nurses and physician to provide necessary medical

care. Ex:4:WeinsteinDec: ¶ 13:7-8. (Jail Officers are sophisticated in recognizing medical

conditions).

      Jail Officers Brownell and Eccles knew something was wrong when Nurse Hibbert

refused to see India Taylor when they reported Taylor's vomiting and heroin withdrawal to her.

127:Ex:6: Eccles Dep:30-36; Ex:1:125-26. The 3 ½ hour delay Nurse Hibbert gave them until the

next Nurse came on duty to see Taylor at 20:00 was an awfully long time. 127:Ecclees Dep:42-

43.  Had there been a means for them to report this unusual event up the chain of command,

Superintendent Smith or Assistant Superintendent Rob McCoy could telephone Dr. Johnson and

instruct him to see that Nurse Hibbert or any other nurse was providing the necessary medical

care the Sheriff had contracted.

There was no such means available here. Ex:4:WeinsteinDec:¶ 13 E: 7. Superintendent Smith believed he could do nothing to question the physician. Dr. Johnson' assurances of compliance with "proper medical procedures and protocols" and "see what we should have been doing to treat her" 127:Ex:2: SmithDep: 101-102. Smith carried this to the point of ignoring Jail Officer Brownell and Eccles' complaints of Nurse Hibbert's denial of medical care to Taylor and the other Jail Officers talk that the Nurse was responsible for Taylor's death. Id:91-104.  Dr. Johnson went to Smith and asked that this talk stopped. Smith responded with a e-mail directing the Jail Officers to cease such talk. Ex:82.

Superintendent Smith completely abdicated the Sheriff's constitutional duty of providing necessary medical care to Dr. Johnson who left it to the Nurses on duty. Johnson never performed any reviews to determine if the Nurses complied with the Advanced Correctional Health Care protocols or the accepted standard of care. 127:Ex:1:JohnsonDep:22-23; 30-31. He says he does that when he is at the Jail. Id:30-31.  His conduct when he pronounced India Taylor dead shows otherwise.  Dr. Johnson does not recall discussing Taylor's chart with Nurse Mattes and he did not review after he left the Jail. 127:Ex:1:JohnsonDep:33-34

Dr. Johnson relied on the pathologist who did not have the expertise to give an opinion on whether the lack of medications caused Taylor's death. That is for a clinical physician. 127:Ex:12:MitchellDep:22-26.  Superintendent Smith relied on Dr. Johnson not even questioning him why the Nurses would think a Nurse caused Taylor's death. 127:Ex:2:SmithDep: 98-104.

No one "gave a damn" about the delivery of necessary care to India Taylor or anyone else. Dr. Johnson left it to the unqualified pathologist and did nothing himself. Smith knew of

33

significant problems apparent to lay person in the delivery of medical care to India Taylor from the Jail Records in his possession.

1. Superintendent Smith was not a physician, but he knew from the Incident Reports of Jail Officers Brownell and Eccles reporting on Nurse Pam Hibbert's refusal to treat India Taylor for the vomiting and heroin addiction. Ex:1:124-25; 129-30.

2. Medical knowledge is not required to conclude that the Jail Officers request for an examination and the follow up Sick Call Request Form completed by Brownell and Eccles for Taylor should have resulted in an examination.

3. One does not need medical knowledge to look at the October 15, 2003 records of India Taylor's incarceration, compare them with those of the July 17 & August 2, 2003 incarcerations and observe the following:

    A. The October 15, 2003 Intake Screening Form listed prescriptions Those prescriptions were not given to Taylor. Ex:1:114-22.

    B. A comparison of the records for that admission with those of the July 17 and August 2, 2003 admissions showed the prescriptions listed were given during those incarcerations. Ex:1:104-05, 108; 109, 113.

    C. The July 17, 2003 incarceration showed Taylor undergoing heroin withdrawal. A liquid diet was prescribed. Ex:106-07.

    D. Heroin withdrawal by Taylor was the condition which lead Jail Officers Brownell and Eccles to seek Nurse Hibber's examination of Taylor on October 16, 2003. 127:Ex:6: Eccles Dep:30-36; Ex:1:125-26; 129-30.

    E. The Sick Call Request Form was completed at 17:40 on October 16, 2003.  127: Ex:6: EcclesDep: 40-46; Ex:1: 125-26; 129-30.

    F. Taylor was never examined until April Cummings found her non-responsive in her cell at 0330. Ex:1:116-122.

Physician oversight for nurses providing medical care is a part of the constitutionally required necessary medical care that must be given to prisoner. *Ruiz v. Johnson*, 37 F.Supp.2d 855, 894 n.60 (S.D.Tex. 1999). Jail Officials also have a responsibility to oversee and monitor

the health care delivered by physicians and nurses to prisoners. *A.M. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 583 (3d Cir. 2004)(holding policy of Juvenile Detention Center of not monitoring actual delivery of health care was a deprivation of the detainees right to necessary medical care).  There can be no other rule.  The Sheriff and his delegated policy maker, Superintendent Smith are the officers charged by law with the duty to operate the Jail. This duty can not be delegated to a contract physician.

The evidence plainly establishes that Superintendent Smith turned "a blind eye" to denial of medical care by Dr. Johnson and the Advanced Correctional Health Care nurses. *Chavez v. Illinois State Police*, 251 F.3d 612,651 (7th Cir. 2001).  Sheriff McCoy and Superintendent Smith rely on the fact that a single incident may not be the basis of municipal Section 1983 liability unless it was caused by an existing unconstitutional policy. *Estate of Novack v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000) citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 824, 105 S.Ct. 2427 (1985).

The human body is an extremely resilient organism. The fact other prisoners died in the one year between Sheriff McCoy's ascension to office in 2002 and India Taylor's death on October 17, 2003 does not relieve Superintendent Smith and Sheriff McCoy from liability. Superintendent Smith was personally involved in the deliberate indifference and he was delegated the policy making authority by Sheriff McCoy. Superintendent Smith is liable in his Individual Capacity and Sheriff McCoy is liable in his Official Capacity.

### C.    There are Triable Issues of Fact on the Claims Against Sheriff McCoy in His Official Capacity and in His Individual Capacity

This responds to Part C 4:26; 31-33. Sheriff McCoy delegated his policy making authority to Superintendent Smith in the management of the Peoria County Jail. This is discussed

in Part III B 1 above. Superintendent Smith's policy of deliberate indifference to the denial of

necessary medical care by Advanced Correctional Health Care and Dr. Johnson is discussed in

Part III B 2 above. Sheriff McCoy is liable for damages in his Official Capacity for the conduct

of Superintendent Smith as are his successors in the Office of Sheriff. *Kinkaid v. Rust*, 670 F.2d

737, 741 (7th Cir. 1982).

Sheriff McCoy's individual capacity liability is determined on whether he personally

participated and was aware of Superintendent Smith's policy of deliberate indifference to the

denial of necessary medical care to prisoners.  Sheriff McCoy meets with Superintendent Smith

every day. 127:Ex;15: McCoyDep:4, 6-8.  The death of India Taylor was matter that Smith

addressed. Sheriff McCoy was aware of his handling of the investigation and determination that

medical protocols had been satisfied. Ex:8.  There is an e-mail from Smith informing Sheriff

McCoy of his conclusion. Ex:8.  That is sufficient for the jury to conclude he was aware of

Superintendent Smith's conduct and approved or condoned it. *Chavez*, 251 F.3d at 651.

In Part C 8, Sheriff McCoy and Superintendent Smith correctly state punitive damages

can not be obtained from a state actor in his Official Capacity. 127:Part C :33. Plaintiff makes no

such claim, so this portion of the motion is unnecessary.

**D.      There is a Triable Issue of Fact on Whether Superintendent Smith Was
Deliberately Indifferent to Dr. Johnson's Shielding the Key Facts of His and
the Advanced Correctional Health Care Nurses' Wrongdoing Which Denied
India Taylor's Survivors of Their Right of Access to the Courts**

The contours of an action for denial of right of access to the courts against a state actor

who shields key facts of wrongdoing is discusses fully in Plaintiff's Response to the Motion for

Summary Judgment of Defendant, Advanced Correctional Health Care, Inc. 142:PartIII C 2:37-

39. The conduct of Dr. Johnson as the policy making agent of Advanced Correctional Health

36

Care is also discussed. 142:Part IV A & B:43-48.

The issue on the liability of Superintendent Smith and Sheriff McCoy is whether Smith as the policy making agent was aware of Dr. Johnson's deliberate indifference to the key facts of India Taylor's death and "just didn't give damn" or turned "a blind eye" to that conduct.   Here are the facts which were known to Superintendent Smith.

1.      Superintendent Smith was not a physician, but he knew from the Incident Reports of Jail Officers Brownell and Eccles reporting on Nurse Pam Hibbert's refusal to treat India Taylor for the vomiting and heroin addiction. Ex:1:124-25; 129-30.

2.      Medical knowledge is not required to conclude that the Jail Officers request for an examination and the follow up Sick Call Request Form completed by Brownell and Eccles for Taylor should have resulted in an examination.

3.      One does not need medical knowledge to look at the October 15, 2003 records of India Taylor's incarceration, compare them with those of the July 17 & August 2, 2003 incarcerations and observe the following:

    A.      The October 15, 2003 Intake Screening Form listed prescriptions Those prescriptions were not given to Taylor. Ex:1:114-22.

    B.      A comparison of the records for that admission with those of the July 17 and August 2, 2003 admissions showed the prescriptions listed were given during those incarcerations. Ex:1:104-05, 108; 109, 113.

    C.      The July 17, 2003 incarceration showed Taylor undergoing heroin withdrawal. A liquid diet was prescribed. Ex:106-07.

    D.      Heroin withdrawal by Taylor was the condition which lead Jail Officers Brownell and Eccles to seek Nurse Hibber's examination of Taylor on October 16, 2003. 127:Ex:6: Eccles Dep:30-36; Ex:1:125-26; 129-30.

    E.      The Sick Call Request Form was completed at 17:40 on October 16, 2003.  127: Ex:6: EcclesDep: 40-46; Ex:1: 125-26; 129-30.

    F.      Taylor was never examined until April Cummings found her non-responsive in her cell at 0330. Ex:1:116-122.

No physician review of the care given India Taylor and its relationship to her death was made until done by plaintiff's expert witness, Dr. Weinstein.  A jury could conclude based on this readily apparent facts that Superintendent Smith acting as the policy making agent of Sheriff McCoy was deliberately indifferent to Dr. Johnson's conduct in shielding the key facts of Taylor's death from her survivors. The result is plaintiff now faces a causation defense that a physician review after Taylor's death would have precluded. See 142:PartIVB 2& 3:46-48.

     **E.**     **Plaintiff is the Duly Appointed Administrator of the Estate of India Taylor by the Circuit Court of Peoria County Authorized to Bring All Claims on Her Behalf Under State and Federal Law**

Plaintiff filed a motion to be appointed administrator of the Estate of India Taylor with the Circuit Court of Peoria County, Illinois. Case No 04 L 361.  Section 27-6 of the Illinois Probate Act provides actions to recover damages for injury to the person survive the death of a deceased. 755 ILCS 5/27-6 (2004). The Survival Act says nothing about any special authorization for a personal representative to bring such an action. The case defendants cite in support of their motion to dismiss holds the administrator of the estate may pursue both an action for wrongful death and a survival action to recover the pain and suffering endured by the deceased prior to death.  *Murphy v. Martin Oil Co.*, 56 Ill.2d 423, 308 N.E.2d 583 (1974). If there is conscious pain and suffering the administrator may pursue both the wrongful death and survival claims.  Id.

Defendants' contention is a matter of form. The appointment of a personal representative to bring an action for a deceased is for the benefit of the heirs, not tortfeasors. If form is exalted over substance, the July 26, 2004 Order appointing plaintiff administrator can be amended to include the magic words "Survival Act" and "funeral bills".  That is unnecessary in light of the

Illinois Supreme Court holding in *Murphy*. Should this court disagree, it should grant plaintiff leave to amend the July 26, 2004 Order of appointment from the Circuit Court of Peoria County.

**F.      The Claim for That the Failure to Observe Taylor Every 30 Minutes Due Because the Jail Was Understaffed is a Denial of Necessary Medical Care Excepted from Immunity, Not a Failure to Supervise Inmates That is Immune Under the Illinois Local Governmental Tort Immunity Act**

April Cummings was overworked with insufficient staff on the graveyard shift of October 16-17, 2003. She had to help with booking and participate in an evaluation. She did not provide the observation required every 30 minutes of India Taylor and the other inmates in that area of the Jail because of this.

Sheriff McCoy and Superintendent Smith do not contend this could not be willful and wanton conduct in their oversight. Nor do they contend proximate cause is not satisfied. They say this is an act of supervision for which there is absolute immunity. 745 ILCS 10/4-103 (2004). India Taylor and the other inmates were asleep at this time. Sleeping persons do not require oversight.  The purpose of the observation every 30 minutes is not to control behavior of sleeping people, but to ensure they are sleeping with no apparent medical problem. This is confirmed by Cummings' conduct at 0330. She tried to awake Taylor and then summoned the Nurse for medical care. Sheriff McCoy and Superintendent Smith are not immune for this deficient condcut which could have provided benefit to Taylor had Cummings observed an arrhythmia and the Nurse with the defibrillator summoned.

**G.      There Are Triable Issues of Fact on the State Claims of Willful and Wanton Conduct Against Sheriff McCoy and Superintendent Smith**

The same matters that establish a triable issue of fact deliberate indifference also establish a triable issue of fact on willful and wanton conduct.

**V.**
**Conclusion**

There are triable issues of fact on the claims against Sheriff McCoy in his Individual and Official Capacities and Superintendent Smith in his Individual and Official Capacities. Their motions for summary judgment must be denied.

Respectfully submitted,

/s Richard L. Steagall
RICHARD L. STEAGALL,
Attorney for Plaintiff

| LOCAL RULE 7.1 (D) CERTIFICATION |
|---|

The undersigned certifies under Local Rule 7.1 (D) that he prepared this document on his law office's Wordperfect word processing system and the word count exclusive of Part II Statement of Material Facts is 7708.

/s/Richard L. Steagall
RICHARD L. STEAGALL

| CERTIFICATE OF SERVICE |
|---|

I hereby certify that on **August 6, 2007**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

William W.P. Atkins
Assistant State's Attorney
Peoria County Courthouse, Rm. 111
324 Main Street
Peoria, IL 61602

Mr. Peter R. Jennetten
Quinn, Johnston, Henderson & Pretorius Chtd.
227 N.E. Jefferson Street
Peoria, IL 61602

/s/Richard L. Steagall

| RICHARD L. STEAGALL | JOHN P. NICOARA |
|---|---|
| Nicoara & Steagall | Nicoara & Steagall |
| Commerce Building | Commerce Building |
| 416 Main Street, Suite 815 | 416 Main Street, Suite 815 |
| Peoria, IL 61602 | Peoria, IL 61602 |
| Tel:  (309) 674-6085 | Tel: (309) 674-6085 |
| Fax:  (309) 674-6032 | Fax: (309) 674-6032 |
| nicsteag@mtco.com | nicsteag@mtco.com |