**E-FILED**
Wednesday, 17 October, 2007  11:15:49 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | | |
|---|---|---|
| Lester Gayton, Jr., Administrator | ) | |
| of the Estate of India Taylor, Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  04-CV-1354 |
| | ) | |
| Michael D. McCoy et al., | ) | |
| | ) | |
| Defendants. | ) | |

BEFORE U.S. MAGISTRATE JUDGE BYRON G. CUDMORE:

### OPINION

Defendants Radcliffe et al. have filed a Motion to Bar Opinions of Corey Weinstein, M.D., Pertaining to Cause of Death (d/e 121).  The other defendants have joined in the motion.  (d/e 123).  After careful consideration of the parties' submissions, and for the reasons detailed below, the Court concludes that the motion should be granted.

## I.  Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert*.  Under this framework, courts determine whether the expert testimony is both relevant and reliable.  It is a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training or education." Fed. R. Evid. 702; the expert's reasoning or methodology underlying the testimony must be scientifically reliable, *Daubert*, 409 U.S. at 592-93, 113 S.Ct. 2786; and the

testimony must assist the trier of fact to understand the
evidence or to determine a fact in issue.  Fed. R. Evid. 702.

Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 904 (7th Cir. 2007).

Plaintiff bears the burden of establishing the admissibility of Dr. Weinstein's

expert testimony by a preponderance of the evidence.  Fed. R. Evid. 702

Advisory Committee Notes, 2000 Amendments (the admissibility of expert

testimony is governed by Rule 104(a), which puts the burden on the

proponent to establish admissibility by preponderance).

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-

95 (1993), the Supreme Court set forth some potentially appropriate factors

to consider when assessing the reliability of expert testimony, including

whether the theory can or has been tested; whether the theory has been

subjected to peer review and publication; the rate of error of the theory

when applied; and, whether the theory is generally accepted. These factors

are not definitive nor do they "all necessarily apply even in every instance

in which the reliability of scientific testimony is challenged."  Kumho Tire

Co., Ltd. v. Carmichael, 526 U.S. 137, 151 (1999); Bourelle v. Crown

Equipment Corp., 220 F.3d 532, 536 n.8 (7th Cir. 2000)("there is no

requirement that the district judge consider each one of *. . . [Daubert]*

'guideposts' when making an admissibility ruling under Fed. R. Evid. 702").

The polestar is "ensur[ing] the reliability and relevancy of expert testimony .

. . . [,] to make certain that an expert, whether basing testimony upon

professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert

in the relevant field."  Kumho, 526 U.S. at 152.

Federal Rule of Evidence 702, amended in response to Daubert,

provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a
> fact in issue, a witness qualified as an expert by knowledge,
> skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based
> upon sufficient facts or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.[1]

"A court is expected to reject 'any subjective belief or speculation.'"

Ammons v. Aramark Uniform Serv., 368 F.3d 809, 816 (7th Cir.

2004)(*quoted cites omitted*).  However, determinations on admissibility do

not supplant the adversarial process.  "Shaky" expert testimony may

nevertheless be admissible, assailable by its opponents through cross-

---

[1]Rule 702 was amended in response to Daubert, to "affirm[ ] the trial court's role as gatekeeper and provide[ ] some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony."  Fed R. Evid. 702, Advisory Committee notes, 2000 Amendments.

examination and the introduction of contradicting evidence.  Daubert, 509 U.S. at 596)( "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.**)**  Nor can the court exclude expert testimony because "the court believes one version of [competing] facts and not the other."  Fed. R. Evid. Advisory Committee Notes, 2000 Amendments (recognizing that "experts sometimes reach different conclusions based on competing version of the facts.").  "The focus, . . . must be solely on principles and methodology, not on the conclusions that they generate."  Daubert, 509 U.S. at 595.

## II.  Dr. Weinstein's Opinions on Ms. Taylor's Cause of Death

### A.  Dr. Weinstein's Preliminary Report[2]

Dr. Weinstein's "preliminary report" of February 1, 2006 states in relevant part:

> 10.  Ms. India Taylor suffered from serious chronic illnesses.  At the time of her 10/15/2003 incarceration in the PCJ[3] she [Ms. Taylor] had been prescribed four medications for her cardiovascular illness by her private physician.  Her medicine regimen was complex and sophisticated: Furosemide, Acetazolamide, Metolazine and Coreg.  Heroin withdrawal

---

[2]Dr. Weinstein's preliminary report, supplemental report, and deposition are attached to Defendants' motion (d/e 121).

[3]Peoria County Jail.

usually causes elevations of heart rate and blood pressure, both of which would make cardiovascular disease worse. Had Ms. Taylor's medication not been interrupted and instead been provided, as is routine and standard in jail medical care; and had her heroin withdrawal been treated as was demanded by PCJ protocol, then it is likely that the lethal event on 10/17/2003 would have been prevented." (2/1/06 preliminary report, p. 2).

## B.  Dr. Weinstein's Supplemental Report

Dr. Weinstein's supplemental report of December 14, 2006 states in

relevant part:

6. . . . On October 15, 2003, prescriptions from Walgreen's Pharmacy were Metolazone, Coreg, Lasix and Acetazolamide. The three diuretic medication and alpha-beta blocker regimen is a sophisticated treatment program for serious cardiac disease. . .

\*             \*             \*

8. . . . Shift notes from jail custody describe [Ms. Taylor] as vomiting violently during all three shifts on 10/16/03.

\*             \*             \*

10. . . . The officers could not have known, but the medical staff should have known that prolonged vomiting in a patient who has been on three powerful diuretics could easily produce electrolyte abnormalities that would worsen cardiac function.

### C.  Dr. Weinstein's Deposition

Dr. Weinstein testified in his deposition of January 12, 2007:

Q.  First thing I want to ask you, how did – what caused India Taylor's death?  What was the mechanism?

A.  I think that is unknown at this time.  The mechanism, I have her death was reported as hypertensive heart disease.

\*          \*          \*

A. . . . The mechanism may very well have been – I think that, given the fact that she died alone in her cell, untreated, without medical supervision or testing, we can only think about the possibilities of the mechanism of her death.

There are two that come to my mind as a general practitioner with 36 years of clinical experience.

One would be that she suffered from electrolyte abnormalities due to her taking for a long time multiple and power diuretic medication for – to treat her cardiomyopathy, and while in jail had repeated vomiting episodes.  That is a particularly risky thing for someone on the kind of medication she had been on which depletes the body of salt content dramatically and put it at a pressure.

So it may be that she died and the main cause of her demise was electrolyte imbalance and acid based abnormalities.  That is one possible mechanism of her actual death.  (Weinstein Dep. pp. 24-25).

\*          \*          \*

A. . . . any small degree of change in acid bases, as well as sodium potassium balance in the body in someone with such

severe cardiac disease in such a comprised [sic] electrical organ which depends on the [sic] those balance a great deal for its viability, could increase the likelihood of heart failure, of cardia erythremia [sic].

We don't know because, by the time she was found, of course, she was in rigor mortis.  (Weinstein Dep. pp. 25-26).

\*                    \*                    \*

Q.  Are you saying that you don't have an opinion as to what her specific cause or mechanism of death was?

A.  I'm saying the data, because she was untreated, unmedicated, unsupervised by medical providers, it's difficult to have an exact –an opinion on the exact nature of her demise, whether it was merely cardiac failure, whether she went into a cardiac erythremia [sic], which is much more common with cardiac myopathy, or whether she had some other kind of acid base imbalance that rendered her heart unable to function and so she died with a rapidly acute congestive heart failure.

That's right, I can't – she might have even had a seizure and died because of electrolyte imbalance.  These are all possibilities.

And I think it would be my opinion that one of them is true, but I can't tell you which might be the exact one, no.

Q.     Are those the four possibilities?

A.  Those are the possibilities in my mind.  (Weinstein Dep. p. 28).

Dr. Weinstein also testified in his deposition that he believed Ms.

Taylor would be alive if she had not been incarcerated in October 2003

because she:

> would have either managed heroin withdrawal or been on
> heroin, and therefore not vomited repeatedly and risked the
> electrolyte imbalances and acid base imbalances that are a
> consequence of someone with her compromised system, so
> that the likelihood is she would have survived those two days.
> (Weinstein Dep. p. 29).

### D. Dr. Weinstein's Declaration

In response to Defendants' motion to bar Dr. Weinstein's testimony,

Plaintiff submitted a Declaration of Dr. Weinstein dated July 27, 2007.  (d/e

139).  Plaintiff asserts that the Declaration is offered to demonstrate Dr.

Weinstein's expected testimony if a Daubert hearing is held. (d/e 137,

p. 7).

> Dr. Weinstein states in this Declaration:

> Since she died untreated and without medical supervision, we
> can only express the possibilities of the mechanism of her
> death.  As a general practitioner, I can identify possibilities of
> the mechanism of her death . . . .

> It may be that she died of electrolyte imbalance . . . Electrolyte
> imbalances such as hypokalemia – low potassium levels–is a
> recognized cause of cardiac arrhythmia.  (Weinstein Dec. ¶ 9).

> He further states that:

> Medically, Taylor's death could have been prevented by
> treating her hypertension, cardiomyopathy, and her vomiting."
> (Dr. Weinstein Dec. ¶ 9(D).

*          *          *

One day of medications, 24 hours or 36 hours of medications may could [sic] have prevented India Taylor's death. . . (Weinstein Dec. ¶9(D)(3).

\*          \*          \*

Vomiting by a patient on powerful diuretics undergoing heroin withdrawal presents a serious risk that potassium and sodium levels in the blood will be depleted causing an electrolyte imbalance.  (Dr. Weinstein Dec. ¶ 12(D)).

\*          \*          \*

My opinion that electrolyte imbalance from vomiting and diuretic medication was a possible cause of India Taylor's death is consistent with the accepted methodology of clinical medicine. Physicians learn the role of the potassium and sodium electrolytes in the blood in regulating the electrical impulse of heart beats in medical school.  Hypokalemia–a potassium deficiency in the blood–is a well documented cause of cardiac arrhythmia which is accepted in medical opinion as a mechanism of cardiac failure and death.  (Weinstein Dec., ¶ 21).

\*          \*          \*

The recognition of potassium deficiency and electrolyte imbalance as a cause of cardiac arrhythmia remains an accepted matter of basic medical knowledge.  It is not necessary to consult literature to confirm this as it was and is a part of medical training of all physicians.  (Dr. Weinstein's Dec. ¶ 24).

## III.  Analysis

### A.    Plaintiff has not demonstrated that Dr. Weinstein is qualified to opine on Ms. Taylor's cause of death.

Defendants argue that Dr. Weinstein is not qualified to render an opinion on the cause of Ms. Taylor's death because the death was "cardiac-related" and Dr. Weinstein is not a cardiologist nor has he any specialty training in cardiology. Defendants do not assail Dr. Weinstein's qualifications to opine on standards of care in correctional medicine, so this order addresses only the cause-of-death opinions.

A witness may qualify as an expert "by knowledge, skill, experience, training, or education , . . . ."  Fed. R. Evid. 702.  "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." Carroll v. Otis Elevator Co., 896 F.2d 210, 212 (7th Cir.1990)(other citations omitted).  That a proffered expert has a medical degree does not automatically qualify him or her to testify as an expert on medical subjects.  *See* O'Conner v. Commonwealth Edison Co., 807 F.Supp. 1367, 1390 (C.D. Ill. 1992)("A medical degree 'alone does not qualify [an expert] to give an opinion on every conceivable medical question."), *quoting* Christopherson v. Allied-

Signal Corp., 939 F.2d 1106, 1112 n. 10 (5th Cir. 1991)(*abrogated on other grounds by Daubert*); Cunningham v. Masterwear, Inc., 2007 WL 1164832 *10 (S.D. Ind. 2007)(fact that proffered experts were medical doctors did "not automatically give them the right to opine on all medically-related subjects in a court of law.").

Dr. Weinstein is a general practitioner in private practice in California. He has seen patients clinically for over 36 years and currently sees patients three days a week.  (Weinstein Dep. p. 10).  He received an M.D. from the University of Illinois at Chicago in 1969, followed by a one-year internship.  He has not completed any part or all of a residency program, nor is he board-certified in any recognized medical specialty.  (Weinstein Dep. p. 9).  He has undergone the "usual continuing medical education," as well as training in the field of homeopathy.  (Weinstein Dep. p. 8).  He is also a certified health professional by the National Commission on Correctional Health Care and a "correctional medical consultant." (Weinstein Dep. p. 13).   He currently has no hospital admission privileges and has not had any since the 1980s.  When one of his patients needs hospitalization, he refers them to colleagues.  (Weinstein Dep. p. 11).

Dr. Weinstein's private practice of 36 years is an impressive accomplishment, as is his laudable work in correctional medicine, but he

has not demonstrated how either qualifies him to opine on what caused

Ms. Taylor's death.  Dr. Weinstein has not identified any experience in his

private practice or in correctional medicine that might confer knowledge

and skill in diagnosing cardiac arrhythmia and its causes.  In fact, Dr.

Weinstein stated in his deposition that, if Ms. Taylor had been his patient,

he would have referred her to a cardiologist, "because her condition

requires that level of expertise."  (Weinstein Dep. p. 39).  Dr. Weinstein

effectively admitted his lack of qualification in the area of causation in his

deposition.  He testified that Ms. Taylor's "terminal event" "could have been

erythremia [sic], but that, "I don't think I have the expertise to opine on what

is exactly the most likely event." (Weinstein Dep. p. 40).

Dr. Weinstein was also asked:

Q.    Would a cardiologist be better to consult with about what
      happened here, what the mechanisms of death was?

A.    I think that a cardiologist would be more schooled in terms of
      understanding those particular issues.  (Weinstein Dep. p. 47).

*          *          *

Q.    Is it your opinion that one day of medication, or 24 hours or 36
      hours of medication, would have prevented this outcome?

A.    I think it would have.

Q.     Okay.  Is that something that a cardiologist would be better able to address?

A.     I think they would be more expert to opine on that, yes.

(Weinstein Dep. p. 49).

Dr. Weinstein was also questioned regarding whether he knew the "characteristics" of the medicines prescribed for Ms. Taylor, such as onset, peak effect and half-life.  He answered, "No, I am not, I am not a pharmacologist."  (Weinstein Dep. p. 69).  At his deposition, he recounted some possible causes of death that "came to mind" but did not settle on one as more likely than another.

After Dr. Weinstein's reports and deposition, Defendants' expert, Dr. Moulton, a cardiologist with training in the subspecialty of clinical cardiac electrophysiology, concluded that "the most likely mechanism of death was that due to a sustained ventricular tachyarrhythmia occurring in the setting of chronic nonischemic cardiomyopathy and which could not have been anticipated.  (Moulton, 4/1/07 report, p.1).  Plaintiff advances that because Dr. Moulton has now determined that Ms. Taylor died of an arrhythmia, Dr. Weinstein is qualified to opine on what caused that arrhythmia.  Yet Dr. Weinstein's adoption of Dr. Moulter's determination only underscores Dr. Weinstein's lack of qualification to opine on what caused Ms. Taylor's

death.  (d/e 137, p. 14)(""Dr. Weinstein's uncertainty over the mechanism of India Taylor's death at the time of his deposition has now been resolved by the testimony of the defendants' cardiac electrophysiologist."); *See* Jones v. Lincoln Elec. Co., 188 F.3d 709, 724 (7th Cir. 1999)(to extent proffered expert was "merely conveying [another expert's research] conclusions . . . " the expert who conveyed those conclusions was the proper person to testify about research findings); Cunningham v. Masterwear, 2007 WL 1164832 *9 (S.D. Ind. 2007)("[N]o physician may testify to his or her opinion based solely on the expert's say so and a medical degree.").  The Court does not understand how Dr. Moulton's opinion qualifies Dr. Weinstein to testify to the cause of Ms. Taylor's arrhythmia.

> **B.    Even if Plaintiff had demonstrated that Dr. Weinstein is qualified to opine on the cause of Ms. Taylor's death, Dr. Weinstein's opinion is not reliable.**

It is not entirely clear that Dr. Weinstein actually *has* a conclusion as to what caused Ms. Taylor's sustained arrhythmia.  Plaintiff represents that "Dr. Weinstein is of the opinion the mechanism of death was cardiac arrhythmia due to an electrolyte imbalance from the diuretics, her vomiting, and the departures from the standard of care by the Advanced Correctional Health Care nurses, " but that is not what Dr. Weinstein's Declaration

states.  His Declaration states only that "electrolyte imbalance from vomiting and diuretic medication was a *possible* cause of India Taylor's death . . . ."  (Weinstein Dec. para. 21)(emphasis added); <u>Wintz v. Northrop Corp.</u>, 110 F.3d 508, 515 (1997)("Under Illinois law, to serve as the sole basis for a conclusion that an act was the proximate cause of the plaintiff's injury, an expert must be able to testify with a reasonable degree of medical certainty that proximate cause existed.").

Plaintiff attributes Dr. Weinstein's uncertainty to Defendants' failure to follow the standard of care, which he believes would have established the facts necessary to enable Dr. Weinstein to state his conclusions with certainty.  For example, Plaintiff contends that Defendants did not keep accurate records on the amount of Ms. Taylor's vomiting, did not observe Ms. Taylor and record those observations, and did not do a blood test which would have disclosed an electrolyte imbalance.

However, existing factual disputes and uncertainties (such as the extent of Ms. Taylor's vomiting) should not prevent Dr. Weinstein from providing an hypothesis based on scientifically reliable methods and principles.  The experts in the cases cited by Plaintiff did so, despite the presence of factual and scientific uncertainties.  For example, in <u>Cooper v. Carl A. Nelson & Co.</u>, 211 F.3d 1008, 1021 (7th Cir. 2000), the District Court

excluded expert testimony on the cause of the plaintiff's chronic pain syndrome because that testimony relied solely on the plaintiff's own description, the veracity of which was disputed.  The Seventh Circuit reversed because patient self-report is an accepted diagnostic tool, even if evidence existed that the self-report was self-servingly false.  211 F.3d at 1021.  *Accord*  Walker v. Soo Line Railroad Co., 208 F.3d 581, 586 (7th Cir. 2000)(expert testimony that relied on self-report that was found to be inaccurate should have been admitted)("factual underpinnings of expert testimony may be subject to counter-attack"); Bass by Lewis v. Wallenstein, 769 F.2d 1173 (7th Cir. 1985)(expert's testimony that chance of survival would have been 10-30% if advanced cardiac life support had been timely administered was sufficient to uphold jury verdict).  Here, in contrast, Dr. Weinstein has not identified exactly what his conclusions are or the facts and methodology upon which they are based.

Dr. Weinstein does conclude with certainty that "departures from the accepted standard of care in correctional medicine were a cause of India Taylor's death from cardiac arrhythmia on October 17, 2003."  (Weinstein Dec. para. 14(D)(3)).  Yet the reasoning behind this conclusion is murky. The conclusion seems to be based on one or a combination of the following: 1) the failure to continue or start Ms. Taylor's prescribed

medicines; 2) the failure to treat Ms. Taylor's heroin withdrawal; and/or 3) the failure to stop or treat Ms. Taylor's vomiting (which Dr. Weinstein concludes was caused by Ms. Taylor's heroin withdrawal.).

As to Defendants' failure to provide Ms. Taylor with her prescribed medicines, Dr. Weinstein opines that 24 to 36 hours of the medicines would have prevented her death. However, he does not detail any of the characteristics of those drugs, admitting that "a cardiologist would have more expertise on the effects of these medications on Taylor's outcome." (Weinstein Declaration, p. 5, para. 9(D)(3))(citing Weinstein Dep.). Three of the medicines were powerful diuretics, by Dr. Weinstein's own description. Dr. Weinstein does not explain how diuretics would have helped Ms. Taylor's assumed dehydrated state from vomiting. One medicine was an anti-hypertensive. Dr. Weinstein does not explain how providing this medicine for 24 to 36 hours would have prevented Ms. Taylor's sustained arrhythmia, much less provide any underlying reasoning.

The same goes for the lack of treatment for vomiting and heroin withdrawal. Dr. Weinstein states generally that vomiting can cause electrolyte imbalance which in turn can cause cardiac arrhythmia. But general scientific truths (i.e., electrolyte imbalances can cause arrhythmia)

cannot be reliably applied to an individual case (i.e., electrolyte imbalance caused Ms. Taylor's sustained arrhythmia) without first establishing the facts or factual assumptions upon which that application is based.  Fed. R. Civ. P. 702(1)(testimony must be based on sufficient facts or data).

Dr. Weinstein makes no attempt to posit how much vomiting over what period of time and under what conditions would cause sufficient electrolyte imbalance to spur a sustained arrhythmia, much less back that hypothesis up with science.  In his deposition, he skirted the question:

Q.    Is there–give me some idea of how much vomiting would be required before you would get the electrolyte imbalance that you are talking about?

A.    I think that – first of all, persistent vomiting does two things.  It removes from the body food stuff that could replace the electrolytes, and it removes salts from the juices of the stomach which are very high in sodium, so that it both depletes that body and removes replacement.  And pure water has no –none of those replacements that are required.

And, in fact, drinking a lot of water would dilute further those salts in her body.

Q.    Okay.  So–

A.    I think, you know, that's all we can say, that they had observed persistent vomiting.  (Weinstein Dep. p. 53).[4]

_____

[4]Dr. Moulton testified in his deposition:

A.    If you vomit a lot and I think over the course of a day, a lot meaning maybe four to ten times in that period – I don't know that anyone knows

Even if Dr. Weinstein had established in general the conditions under which vomiting causes sustained arrhythmia, he does not set forth the factual assumptions on which he grounds application of that general principle to *Ms. Taylor*'s arrhythmia.[5]  *See, e.g.,*  Wintz v. Northrop Corp., 110 F.3d 508 (7th Cir. 1997)(Seventh Circuit upheld the exclusion of a

---

the answer to this because everyone's different; but repeated vomiting would eventually, within a time frame of two or three days, because it takes time for electrolyte losses from vomiting to equilibrate into the body to where it's going to end up at some disturbed state, it would require a lot of vomiting to lead to such a condition.  (Moulton Drp. P. 65).

\*             \*             \*

Q.     So, if there were significant vomiting over two or three days, could that have been a cause of the death?

A.     I don't think so.  You know, I think the idea that someone were vomiting a lot is going to create problems, sort of non-specifically, but I wouldn't go so far as to say that it would cause her death.

Q.     If there's an electrolyte imbalance, could that cause a cardiac arrhythmia?

A.     Well, it certainly could. (Moulton Dep. pp. 68-69).

\*      \*      \*

A.     We have pretty limited ability to try to implicate vomiting in the context of creating metabolic disorder from it.  I don't think that's occurred here. (Moulton Dep. p. 76).

Dr. Moulton in his report wrote, "Even in the presence of repeated vomiting over a 24-28 hour period, which would be required to cause significant electrolyte disturbances, sustained ventricular tachyarrhythmias would not be an expectation." (Moulton letter dated 4/1/07).

[5]As already discussed, it appears that Dr. Weinstein only identified this as one possibility, but for the sake of argument the Court assumes he would so testify.

toxicologist's opinion that exposure to bromide caused the birth defects of an infant–general principles of bromide exposure not applied reliably to sufficient facts or data).[6]

Dr. Weinstein also fails to demonstrate how his conclusions are the product of reliable principles and methods.  Plaintiff advances that Dr. Weinstein used differential diagnosis in reaching his conclusions.

> Differential diagnosis generally provides a framework in which all reasonable hypotheses are 'ruled in' as possible causes of a medical problem and some of these possible causes are then 'ruled out' to the extent scientific evidence makes it appropriate to do so.  The goal is to identify the last remaining, or most probable, 'ruled in' cause of a medical problem."

 Ervin v. Johnson & Johnson, Inc., 492 F.3d 901, 903 (7th Cir. 2007).

Dr. Weinstein did not use differential diagnosis because he did not identify and rule out other possible causes of Ms. Taylor's arrhythmia.  The possibilities he recounts in his Declaration relate to her "terminal event," which he now agrees with Dr. Moulter was a sustained ventricular arrhythmia.  (Weinstein Dec. ¶ 9)  He discusses in his Declaration electrolyte imbalance as a possible cause of Ms. Taylor's arrhythmia, but

---

[6]"[T]he expert's] methodology in attempting to relate the general principles of toxicology and bromide exposure to the facts of this case appears to have been based less on a scientific understanding of the specifics of . . . [the] workplace exposure . . ., and more on merely a general understanding of bromide, with only supported speculation having been used to relate the general knowledge to the facts . . . ."  Wintz, 110 F.3d at 514.

he does not discuss or rule out any other possible causes.  "[H]ypothetical alternatives must themselves have 'analytically sound bases' so that they are more then mere 'speculation. . . .'" Smith v. Ford Motor Co., 215 F.3d 713, 719 (7th Cir. 2000)(*quoted cite omitted*); *see also* Rosen v. Ciba-Giegy Corp., 78 F.3d 316 (7th Cir. 1996)(cardiologist's testimony that wearing a nicotine patch for three days could cause a heart attack not admissible where not backed up with scientific, statistical or experimental data and cardiologist did not discuss other possible causal factors).

   In sum, the "analytical gap between" Dr. Weinstein's conclusion that Defendants failed to follow the standard of care and his conclusion that those failures caused Ms. Taylor's death is too great.  General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  His opinions regarding the cause of Ms. Taylor's death are, on this record, a "hunch[es], . . . lack[ing] scientific rigor." Rosen, 78 F.3d at 319-20.

**IV.  Defendants' Request to Strike Dr. Weinstein's Declaration**

Defendants ask the Court to strike Dr. Weinstein's Declaration to the extent it states opinions not previously disclosed.  (Def. Reply, d/e 153, p. 2).  This order moots the request in relation to opinions on the cause of death.  To the extent Defendants seek to strike opinions on the standard of care, the Court will take the Defendants' arguments into account when ruling on the pending summary judgment motions. (Def. Reply, d/e 153, p.2, ¶¶ (c) and (d)).

IT IS THEREFORE ORDERED that Defendants' Motion to Bar Opinions of Corey Weinstein, M.D., Pertaining to Cause of Death is granted (d/e 121).

ENTER:   October 17, 2007

s/ Byron G. Cudmore

_____
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE