E-FILED

Monday, 21 April, 2008  03:44:17 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | |
|---|---|
| Lester Gayton, Jr., Administrator of the Estate of India Taylor, Deceased, )<br><br>Plaintiff, )<br><br>v. )<br><br>Michael D. McCoy, Sheriff of Peoria County, Illinois, Steven S. Smith, Corrections Superintendent of Peoria County, Illinois, Olivia Radcliff, a Nurse of Advanced Correctional Health Care, Inc., Patricia Mattus, a Nurse of Advanced Correctional Health Care, Inc., Norman Johnson, M.D., President of Advanced Correctional Health Care, Inc., and Peoria County, Illinois )<br><br>Defendants[1]. )| No.  04-1354 |

## OPINION

**BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:**

India Taylor died in October 2003 while a pretrial detainee at Peoria

County Jail.  Before the Court are Defendants' motions for summary

---

[1]On Plaintiff's motion (d/e 148), Defendants Eccles, Browning and Mattus were dismissed with prejudice on August 8, 2007.

judgment.  After a careful review of the record, the Court concludes that summary judgment must be granted for the defendants.

## Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Evidence is viewed in the light most favorable to the non-movant, with material factual disputes resolved in the non-movant's favor.  Anderson, 477 U.S. 242, 255 (1986) (*citing* Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial."  Mechnig v. Sears*, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988).

## Undisputed Facts

The court finds the facts in this section to be undisputed, based on a thorough review of all the evidence submitted in support of and in

opposition to the summary judgment motions.  The depositions cited may be most readily found at docket entry 127.  Cites to Plaintiff's exhibits are located at docket entry 149.  Cites to "ACH" exhibits are located at docket entry 128.   Defendants' material proposed facts to which Plaintiff admits are set forth largely verbatim.

On April 26, 2003, India Taylor saw Dr. Azizur Rehman at Methodist Medical Center.  Rehman Dep. at 6.  Dr. Rehman was covering for Dr. Bowman.  Schmidt Dep. at 42; Rehman Dep. at 5.  Dr. Bowman was apparently Taylor's regular physician, or at least she identified him as such in jail records.  At the hospital, Taylor complained of shortness of breath, swelling in her legs and feet.  She denied use of illegal drugs.  Rehman Dep. at 6, 9. Upon examination, Dr. Rehman noted that Taylor was morbidly obese and had discomfort with breathing and swelling in her lower extremities. Rehman Dep. at 7.  Taylor received a number of tests, including a "B and peptide" which indicated congestive heart failure. Rehman Dep. at 10.  Dr. Rehman diagnosed Taylor with "congestive heart failure, morbid obesity, diabetes mellitus, hypertension, and pseudotumor cerebri." Rehman Dep. at 11.  Dr. Rehman was concerned that one of her conditions, most likely CHF (congestive heart failure), would become fatal if she was

not treated on an inpatient basis. <u>Rehman Dep.</u> at 13-14. She had "severe dilated cardiomyopathy" which "carries a very poor prognosis." <u>Rehman Dep.</u> at 14.

Dr. Rehman referred Taylor to Dr. Paul Schmidt, a physician who is board certified in cardiology, interventional cardiology and internal medicine. Dr. Schmidt works with a practice group known as "HeartCare Midwest." <u>Schmidt Dep.</u> at 6, 7.  Dr. Schmidt concluded that Taylor was suffering from heart failure he termed as idiopathic dilated cardiomyopathy. <u>Schmidt Dep.</u> at 30.  Dilated "means obviously stretched"; "cardiomyopathy means heart muscle illness"; and, idiopathy means cause unknown.  <u>Schmidt Dep.</u> at 30. Taylor remained at the hospital until May 2, 2003. <u>Rehman Dep.</u> at 12.

Upon discharge from Methodist Hospital on May 2, 2003, Taylor was given the following prescriptions:

1. Lasix 80 mg (a diuretic, same as Furosemide)
2. Zaroxolyn 2.5 mg daily (a diuretic)
3. Mavik 2 mg daily (an ace inhibitor)
4. Coreg 3.125 mg daily (a beta-blocker)
5. Diamox 250 mg daily (a diuretic, same as Acetazolamide)
6. Amaryl 4 mg daily (for diabetes)

<u>Schmidt Dep.</u> at 34, 38, 42, 43; <u>Johnson Dep.</u> 79-80; <u>Moulton Dep.</u> 38.

The starting dose of 3.125 mg of Coreg is a "very, very tiny initial starting dose."  Schmidt Dep.  at 43. Normally, Dr. Schmidt would try to increase the dosage "to 25 milligrams twice a day by doubling it every two to four weeks."  Id. Taylor was only given a 30-day prescription so that she would return for follow up visits. Schmidt Dep. at 34.   According to Walgreens' records, Taylor was dispensed a 30-day supply of these medicines, except perhaps of the Diamox, which does not appear to be in those records.  ACH Ex. F. at 16, 17.

Taylor missed four follow-up appointments with Dr. Schmidt and was a no-show for two others. Schmidt Dep. at 18. Because "Taylor had been seen in the hospital, . . . had severe heart failure, . . . needed ongoing care" and failed to keep her appointments, Dr. Schmidt ultimately discharged Taylor from his practice on or about June 25, 2003, with a letter advising her to see her primary physician or go to the ER with any acute problems. Schmidt Dep. at 17-19.

Dr. Schmidt testified that Taylor had a mortality risk of 40-60% in the following year if she did not "reliably" take her medications. Schmidt Dep. at 28-29, 31. Her risk would be reduced by about 50% (to approximately a

20% risk of mortality within one year) if she did take her medications. Schmidt Dep. at 35-36.

Taylor was arrested on July 1, 2003.   ACH Ex. J. She complained of chest pain and was taken to the emergency room at Methodist Medical Center.  Taylor was apparently taken to the jail after the emergency room visit because on July 2, 2003, Defendant Mattus faxed HeartCare Midwest asking for Taylor's medical history, treatment and medication list for congestive heart failure and cardiomyopathy.  Pl. Ex 1 at 102; Mattus Dep. at 11. The parties do not discuss this incarceration further.

Defendant Dr. Norman Johnson is a board certified internist.  Johnson Dep. at 4. At the time of the events alleged in the complaint, he was president and CEO of Advanced Correctional Healthcare, Inc. ("ACH"). ACH is a corporation owned and operated by Dr. Johnson to provide medical treatment to jails. Johnson Dep. at 7-8.  Pursuant to ACH's contract, Dr. Johnson served as medical director for the jail and saw patients there.  Johnson Dep. at 11, 100.  Defendants Radcliff, Mattus and Hibbert were employed by ACH and worked as nurses at the jail.

On July 17, 2003, Taylor was arrested again and complained of chest pains.  She was taken by ambulance to Proctor Hospital and seen by Dr.

Ute Prohaska.  Prohaska Dep. at 7-8; ACH Ex. O.  According to Dr.

Prohaska's report, Taylor reported that she had been having chest pains for

two days, had been noncompliant with her medications, and was unsure

when she last took her medications regularly.  Prohaska Dep. at 29-30.  At

various times on July 17, her blood pressure was 151/70, 149/91 and

139/67. These were "all in a fairly normal range." Prohaska Dep. at 17-18.

Dr. Prohaska wrote Taylor a prescription for 10 days worth of the following

medications: Amaryl, Zaroxolyn, Coreg, Diamox, and Lasix.  Prohaska Dep.

at 14-15.

On July 17, 2003, Taylor was transferred to Peoria County Jail upon

her discharge from the hospital.  Prohaska Dep. at 11.  While at the jail, on

July 18, 2003, Taylor complained that she was throwing up due to heroin

withdrawal. Radcliff Dep. at 11, 19-20; ACH Ex. T.  She vomited and

complained of "aches."  Radcliff Dep. at 19; ACH Ex. U.  Taylor was

observed as  "real sweaty, clammy, complaining of her stomach hurting,

nausea . . . ." Cummings Dep. at 11.   According to the medical progress

notes, Taylor reported that she used $100 of heroin per day for a year and

that she had last used heroin at 1:00 p.m. the day before her incarceration.

The medical treatment plan was to give Taylor two medications to address

her symptoms of heroin withdrawal: Donnatal (for nausea) and Vistaril (a sleep aid).  ACH Ex. U; Johnson Dep. 27-28.  The jail records indicate that she received substitutes for those medicines:  Belladonna (substituting for Donnatal) and Hydroxyzine (substituting for Vistaril).  Plaintiff's Ex. 1 at 108; Johnson Dep. at 82; Mattus Dep. at 12.  Taylor also received a clear liquid diet.  Plaintiff's Ex. 1 at 107.

According to the medical progress notes, Taylor also reported that she had not brought her heart medications (listed as Coreg, Diamox, Lasix, Amaryl and Avandia) and would not be able to call home for them.  The medical plan was to refer Taylor to the jail physician when the physician arrived.  ACH Ex. U.  Taylor was released from jail on July 19, 2003. Mattus Dep. at 18; ACH Ex. X.  There is no evidence Taylor received any of her heart medications during this incarceration.  The jail records show only that Taylor received Belladonna and Hydroxyzine for her heroin withdrawal.  It is not clear what became of the ten day prescription from Dr. Prohaska.

On July 20, 2003, the day after Taylor was released from jail, she presented to the Methodist Medical Center emergency room complaining of shortness of breath and chest pain.  ACH Exs. Z, AA.  Her blood pressure

was 160/90.  ACH Ex. AA.  Taylor filled the following prescriptions at

Walgreens on July 24, 2003:

> 1. Furosemide 80 mg (a diuretic, same as Lasix)(rx # 1235287)
> 2. Zaroxolyn 2.5 mg daily (a diuretic)
> 3. Coreg 3.125 mg daily (a beta-blocker)(rx # 1235291)
> 4. Acetazolamide 250 mg daily (a diuretic, same as Diamox)(rx # 1235292)

These prescriptions were for 30 days and provided for one refill.  ACH Ex. F

at 2. These prescriptions were the same as those from Dr. Schmidt, except

there was no Mavik (ace inhibitor) or Amaryl prescribed.  The Walgreen

records indicate that the prescriptions originated from Dr. Bowman.  The

Coreg was still at the very low dose of 3.125 mg daily.

Taylor was arrested again on August 2, 2003 and was incarcerated at

the jail from August 2-28, 2003.  ACH Ex. BB & CC.  During that time,

Taylor did not complain of heroin withdrawal.  ACH Ex. DD & EE; Radcliff

Dep. at 21-22; Hibbert Dep. at 69-70.  When Taylor arrived at the jail this

time, she brought medications with her.  The medications were Coreg,

Acetazolamide, Zaroxolyn and Lasix (Furosemide), Radcliff Dep. at 21,

which match the medications filled at Walgreens on July 24, 2003.  Taylor

saw Nurse Radcliff and reported that she had been diagnosed with

congestive heart failure, hypertension, and non-insulin dependent diabetes mellitus.  Radcliff Dep. at 21.

Dr. Johnson recommended that Taylor continue the cardiac medications that she had brought with her. Radcliff Dep. at 21-22. Taylor received those while she was in the jail from August 3 through August 28, 2003.  Radcliff Dep. at 15; Mattus Dep. at 13-14; ACH Ex. CC.  She was also scheduled for regular blood pressure and blood sugar checks.  Mattus Dep. at 16.  There were several times during the August incarceration that Taylor refused her medication.  Mattus Dep. at 13-14.

A medical history of Taylor was taken by Pam Hibbert on August 21, 2003. It noted that Taylor had a history of non-insulin dependent diabetes, congestive heart failure, hypertension and street drug use (reportedly, heroin and crack cocaine since 1995).   Hibbert Dep. at 20-21; ACH Ex. I. Taylor was reported as 5'2" tall, weighing 294 lbs., with a blood pressure of 146/80.  Hibbert Dep. at 20-21; ACH Ex. I.  Taylor was released from the jail on August 28, 2003.

If taken as directed, the prescriptions Taylor filled at Walgreens on July 24, 2003, would have run out around August 24, 2003.  There is no

record that the prescriptions were refilled, or were attempted to be refilled, until October 15, 2003, when Taylor was incarcerated for the last time.

Taylor presented to the Methodist Medical Center emergency room on September 6, 2003. She complained of a migraine and reported that she had been off her medications for four days, but had just found her bottles of medication. Ex. HH.  The parties do not discuss this visit in any further detail.

Taylor and her mother were arrested on the afternoon of October 15, 2003 and taken to the Peoria Police Department for questioning.  Green Dep. at 19-20, 22-23.  Taylor did not complain of any medical problems to the police.  Green Dep. at 27-28.  Officer Curtis Lindsay transported Taylor and her mother to the Peoria County Jail on October 15, 2003. Lindsay Dep. at 13-14.  Lindsay has no recollection of Taylor making any medical complaints during transport, nor were any documented.  Lindsay Dep. at 14-17.[2]

New inmates at the jail are taken to booking and then "dressed in." After an inmate is dressed in, they are taken to medical.  Eccles Dep. at

---

[2] The plaintiff asserts that Taylor did not need to request medical attention from the police, since she knew she could ask at the jail.  (d/e 142, p. 10, ¶ 53).  However, this is material evidence tending to show that Taylor was not in observable medical distress when she arrived at the jail.

18-19. Taylor was booked in the jail at about 1:00 p.m. on October 15,

2003.  Officer Brownell was Taylor's intake officer.  Brownell filled out an

intake screening form at 4:36 p.m., writing down Taylor's responses.

Brownell Dep. at 14, 16; ACH Ex. NN; Plaintiff's Ex. 1 at 114. The first page

of that form indicates that Taylor reported that she was sick and needed

medical attention for chest pains.  The form identifies Dr. Bowman as

Taylor's doctor treating her for heart failure.  The form also lists some of the

medications India said she was currently taking, "Diamox, Lasix, etc."

Brownell did not write down all the medicines because Taylor told her that

the jail already had a record of the medicines.  Brownell Dep. at 17.  There

is a reverse side to the intake form, but it is missing.  An example of what

that reverse side looks like can be found on the intake form for Taylor's

August incarceration, which does have the second page.  ACH Ex. BB.  The

reverse side sets forth additional check lists for medical history and

complaints, has a "disposition" section and a place for the inmate to sign to

authorize medical treatment.  Id.

After completing the intake form, Officer Brownell took Taylor to see

Defendant Nurse Radcliff, a licensed practical nurse employed by ACH and

working at the jail.  Nurse Radcliff checked Taylor for head lice.  Radcliff

Dep. at 22. Taylor complained of nausea and was given Pepto-Bismol tablets. Radcliff Dep. at 16-17.  Radcliff does not recall Taylor making any complaints of heroin withdrawal at the time and no such complaints were documented. Radcliff Dep. at 17. However, Officer Brownell was present during this encounter and recalled in a memo written after Taylor died that Radcliff had told Taylor that she would not receive any heroin medicine until she starting vomiting.  Plaintiff's Ex. 1 at 129.  Brownell also wrote in that report after Taylor's death that Radcliff had asked India about her heart failure, chest pains and heroin withdrawal.  Radcliff did not take Taylor's vitals (temperature, pulse, respiration), but she did ask Taylor what was making her sick and also asked about the chest pains and how severe they were.  Brownell Dep. 20; Plaintiff's Ex. 129.

Taylor told Nurse Radcliff about her prescription medications for her heart condition (some of which were already listed on the intake form) and was allowed to call her family to have them bring her medications. Brownell Dep. at 38.   Taylor called her brother, Lester Gayton, and asked him to get her prescriptions filled and to bring them to the jail.  Gayton Dep. at 35. Radcliff put Taylor on the list to have her blood pressure checked each of

the next three mornings and the following week. <u>Hibbert Dep</u>. at 59-60; <u>ACH Ex. PP</u>.

Radcliff's medical notes for October 15, 2003, state in relevant part: "Taylor  – brother to bring meds tomorrow if not – notify Dr. Johnson. She has CHF." <u>Radcliff Dep</u>. at 29-30, 33; <u>ACH Ex</u>. QQ.  Radcliff's shift ended at midnight. <u>Radcliff Dep.</u> at 34. She did not see Taylor again after the end of her shift on October 15, 2007.  <u>Radcliff Dep</u>. at 34.  After intake, Brownell took Taylor back to her cell block.  Brownell's shift ended at 10:00 p.m. Brownell did not see Taylor again until October 16, 2003, when Brownell came on shift at 1:30 p.m. and did her head count.

Taylor's brother did go to Walgreens to pick up the prescriptions, but he could not get them because "there was a problem with her medical card." <u>Gayton Dep</u>. at 35-36.   Walgreen's receipts for October 15, 2003, show a refill for Furosemide (80mg), Acetazolamide (250mg), and Coreg (3.125 mg), which match the rx numbers from the July prescriptions.  <u>ACH Ex. S</u>. There is a receipt for another medicine, Metolazone 2.5 mg, which is apparently the same as Zaroxolyn.[3]  <u>ACH Ex. S</u>  The records do not show that the prescriptions were actually filled on October 15, 2003.  The Court

---

[3]See <u>www.nlm.nih.gov/medlineplus/druginfo</u> (Last visited 4/15/08).

agrees with Defendants that this is consistent with Taylor's brother not being able to pick up the medications.

Taylor's brother did not notify Taylor or the jail staff that he could not bring the medications. <u>Gayton Dep</u>. at 38.  No one at the jail followed up on whether Taylor's medications had been brought in.

April Cummings was a correctional officer working the third shift at the jail (9:30 p.m. to 6:00 a.m.). <u>Cummings Dep</u>. at 8.  Cummings observed that Taylor had a "dry, forced vomiting" on the night of October 15. <u>Cummings Dep</u>. at 13, 14. Taylor called Cummings to her cell to show the Cummings that she had vomited in her toilet. <u>Cummings Dep</u>. at 14. Taylor did not complain of any symptoms other than vomiting and Cummings did not observe any symptoms other than the vomiting.  <u>Cummings Dep</u>. at 19-21. Cummings took Taylor down to medical during the normal "med run" between 4:00 and 4:30 a.m. on October 16, 2003. <u>Cummings Dep</u>. at 15.

Nurse Defendant Patricia Mattus, a registered nurse, worked the night shift from midnight to 8:00 a.m. on October 16, 2003.  <u>Mattus Dep</u>. at 9. Nurse Mattus saw Taylor at 4:30 a.m. on October 16, 2003. <u>Mattus Dep</u>. at 21-22.  Officer Cummings told Mattus that Taylor had vomited in her toilet. It is not clear, but it appears that Taylor at first attempted unsuccessfully to

vomit in front of Mattus until a garbage can was placed in front of her.

Mattus concluded that Taylor was causing herself to vomit in order to

receive drugs.   Plaintiff argues that Mattus had no factual basis for this

conclusion.  However, Mattus explained the basis for her conclusion in her

testimony.  Reading her medical notes from this encounter, Mattus testified:

> . . . "As soon as inmate sat down in chair, she started to make
> sounds as though to vomit.  Inmate without emesis until several
> minutes later when lined can is placed in front of her."  And then
> in parentheses this is what she told to me.  "I was told I had to
> vomit before I could get any meds."  And then, "Officer reports
> inmate without complaints all night.  Inmate was able to stop
> emesis completely when this nurse explained to her will need to
> be N.P.O until emesis has stopped."  N.P.O. means nothing by
> mouth or as tolerated.  You don't want to be putting anything in
> if nothing is staying. . . . And she stated in parentheses, "I'm not
> going to vomit any more.  I'm done."  Mattus Dep. at 24 (reading
> medical progress notes).

Officer Cummings recalled that Taylor was upset about not receiving

any medicine for her vomiting.  Cummings Dep. at 17.

Vomiting alone is not necessarily indicative of heroin withdrawal.

Mattus Dep. at 45.  A person in heroin withdrawal typically has additional

symptoms such as clammy skin, goose bumps, profuse sweating, trembling,

aches and pains.  A person in heroin withdrawal may be drawn or pale and

will appear to be in generally poor condition. Radcliff Dep. at 44; Hibbert

Dep. at 72-73; Weinstein Dep. at 32.  Mattus did not observe any of these

other symptoms.  Officer Cummings testified that Taylor did not complain of any symptoms other than the vomiting, nor did Cummings observe Taylor to be sweaty, clammy, trembling or have any other unusual symptoms other than looking nauseous.  Cummings Dep. at 20-21.

Mattus' plan was to continue monitoring for vomiting and to have Taylor back for a blood pressure check again after breakfast.  Mattus Dep. at 25. Mattus testified that she was unable to obtain Taylor's vitals at 4:30 a.m. because of Taylor's attempts to vomit, so she put Taylor on the morning sick call list. Mattus Dep. at 25.

Defendant Nurse Pam Hibbert saw Taylor during sick call at approximately 9:00 a.m. on October 16, 2008.  Hibbert Dep. at 25.  Hibbert is the site manager for ACH and has been a licensed practical nurse since 1984. Hibbert Dep. at 6-7.  Hibbert checked Taylor's blood pressure which was 168/90.  Hibbert Dep. at 25.  Dr. Johnson testified that a blood pressure of 168 over 90 was "a little on the high side, but it's not abnormal enough to create any problem."  Johnson Dep. at 94. Hibbert's notes state that Taylor "attempted to have emesis numerous times while in medical. Unable to show staff emesis. Sent back to cell monitored."  Hibbert Dep. at 25. Hibbert testified that she did not observe Taylor exhibiting signs or

symptoms of heroin withdrawal. Hibbert Dep. at 70-71.  She stated that she

can usually tell if someone is in heroin withdrawal just by looking at them:

"They sweat profusely.  They look bad.  They're drawn or pale.  A lot of

times they're trembling."  Hibbert Dep. at 72.  Hibbert, like Mattus, believed

Taylor was drug seeking.  Hibbert Dep. at 29.

Officer Brownell came back on shift at 1:30 p.m. on October 16, 2003.

She did her head count and observed Taylor sleeping.  Brownell Dep. 23-

25.  Around 3:00 p.m., Officers Brownell and Eccles escorted Taylor to the

back of the jail, about 25 feet from her cell, to appear for "bonding court" by

video conference.  Eccles Dep. at 33, 39. Officer Eccles testified that Taylor

was moving slowly but did not have difficulty getting to bonding court.

Eccles Dep. at 34.

During the bonding court hearing, "the judge came on the screen and

was – started talking to them and Taylor started vomiting or doing the thing

that she was getting ready to vomit . . . ."  Brownell Dep. at 26.  Brownell

placed a garbage can next to Taylor and went into the hallway to call

medical.  Brownell Dep. at 27.  Hibbert was still on shift at that time and told

Browning to call her back when court was over.  Id..  Taylor did vomit into

the garbage can while at bonding court and told Eccles that she was having

heroin withdrawals.  Taylor had dry heaves but did not vomit on the way back to her cell after the hearing, where she lay down.  Browning Dep. at 28-29; Eccles Dep. at 35.  Officer Eccles testified that she believed Taylor's behavior was consistent with someone in heroin withdrawal, but her foundation for this conclusion is not clear.  Eccles Dep. at 35.

After bonding court, about 3:30 p.m., Officer Brownell called Nurse Hibbert but was unable to speak to Hibbert.  Brownell Dep. at 27-28. Hibbert returned the call and spoke to Officer Eccles.  Id.  Eccles told Hibbert about Taylor's vomiting and Taylor's complaint of heroin withdrawal. Hibbert replied that she had no knowledge of Taylor using heroin.  Eccles Dep. at 38.  Hibbert came to verify the vomit in the garbage can and told the officers that Taylor needed to fill out a sick call request, that her shift was over at 8:00 p.m., and that the nurse on the next shift would take care of it. Brownell Dep. at 30; Eccles Dep. at 38.[4]

Around 5:40 p.m. on October 16, 2003, Officers Eccles and Brownell took a sick call request form to Taylor in her cell.   At that time, Taylor was sleeping on her left side facing the wall.  Eccles entered the cell and woke Taylor, who rolled over and sat up.  Eccles asked Taylor if she "doing all

---

[4]Hibbert has a substantially different version of what happened, but the court must take the officers' version as true for purposes of summary judgment.

right." Taylor did not have any complaints, did not show any signs of distress or trouble with her breathing and said she was "feeling a little better." Eccles Dep. at 43-44. There was no sign of vomit in Taylor's cell. Eccles Dep. at 65.  The sick call request form was completed and Eccles put the sick call request in the intake box for the nurses per procedure. Eccles Dep. at 46.  That request form is also missing.

Officer Brownell wrote a jail incident report against Nurse Hibbert because she thought Hibbert had ignored a significant medical complaint. Brownell Dep. at 45.  Brownell wrote the incident report on October 16, 2003, before Taylor died.  Brownell Dep. at 35; Plaintiff's Ex. 1 at 127 (incident report).

It is not clear how much Taylor vomited at the bonding hearing. Officer Eccles testified that she did not believe Taylor was faking her vomiting at the bond hearing, though the vomiting did not seem to be a large amount.  Eccles Dep. 35.  Brownell wrote in her incident report that Taylor had vomited "most of the time" during the hearing.  Plaintiff's Ex. 1 at 129.

Officer Brownell performed a bed check on inmates around 9:00 p.m. on October 16, 2003.  Brownell testified that Taylor was alive at that time.

(<u>Brownell Dep</u>. at 43.).  Officer April Cummings worked the third shift on

October 16th, from 9:30 p.m. to 6:00 a.m.  <u>Cummings Dep.</u> at 7-8.   She

performed several cell checks of Taylor's pod on the night of October 16-17,

2003.  Cummings did not, however, make her rounds every half hour as

required because other matters required her attention. On each occasion,

Taylor appeared to be sleeping on her left side facing the wall, her normal

position. <u>Cummings Dep</u>. at 25-36.

Taylor was on the list of inmates to be taken to medical on the

morning of October 17, 2003.  <u>Cummings Dep</u>. at 36-37.  Officer Cummings

went to Taylor's cell at about 3:30 a.m. and asked Taylor if she wanted to

go to medical.  Taylor was still lying on her left side and appeared to be

asleep. Cummings Dep. at 41.  Cummings did not receive a response.

Officer Cummings went into Taylor's cell and pushed her, but received no

response. Officer Cummings did not notice anything except that she could

not get Taylor up, so she went on to other inmates scheduled for medical.

<u>Cummings Dep</u>. 38-39.  Officer Cummings asked another inmate to wake

up Taylor, and went to the second level of the pod to get two inmates. On

the way back down, Officer Cummings asked whether the inmate had been

able to wake Taylor, and the inmate told Cummings she did not think Taylor

was breathing.  Cummings Dep. at 40.  Officer Cummings went into Taylor's cell and pushed her again and then called Nurse Mattus at 3:40 a.m.. Cummings Dep. at 40.  Unsuccessful attempts were made to revive Taylor. Mattus Dep. at 29-32. An AED (Automatic External Defibrillator) was applied, but recommended that no shock be given. Mattus Dep. at 37-38. Taylor was 32 years old when she died.  ACH Ex. DDD at 1.

Dr. Johnson came to the jail immediately upon learning of Taylor's death. Johnson Dep. at 32. He reviewed Taylor's medical record and spoke with the investigating officer, Detective Quast. Mattus Dep. at 22; Johnson Dep. at 34.  He was not contacted by any of the jail staff regarding Taylor before Taylor's death. Johnson Dep. at 53.  During the relevant time frame, Dr. Johnson was on call for the jail staff 24 hours per day, 7 days per week and could be reached by phone at any time. Johnson Dep. at 76.

No evidence of vomiting or diarrhea was found in the toilet, sink or anywhere else in Taylor's cell.  As part of the investigation, Officer Brownell wrote a confidential memorandum on October 17, 2003, after Taylor died, essentially recounting the same facts as in her incident report.  Brownell Dep. 34-36).  Brownell also wrote a confidential memorandum recounting Nurse Radcliff's encounter with Taylor on intake on October 15, 2003.

Plaintiff's Ex. 1 at 129. Officer Eccles also completed an incident report and confidential memorandum as well, as part of the investigation, recounting the bonding hearing incident.  Plaintiff's Ex. 1 at 123, 125.

On October 20, 2003, Defendant Smith, the Jail Superintendent, sent the following e-mail to Sheriff McCoy:

> Dr. Johnson stopped by and said there are a lot of rumors and talk from jail staff that nurse Patty [Defendant Mattus] is to blame for the inmate's death.  Patty is upset that this is being said.  I don't know why anyone would be saying this.  We need to find out who is saying this and get it stopped-or hear why they think that way.  If there's more to the story I want to hear it.  We are all here working together and trying to place blame on a nurse, a jail officer, or anyone else is not fair.  Taylor lived her own life and probably made some bad choices along the way which finally caught up with her.

ACH Ex. ZZ (bracketed material added).

The doctor performing the autopsy noted that Taylor's heart was enlarged and had concentrical thickening of the left ventricle, indicating longstanding hypertension (high blood pressure). Mitchell Dep. at 19.  Dr. Mitchell found no evidence of a myocardial infarction (heart attack), which would have been apparent. Mitchell Dep. at 30.  He found no evidence of congestive heart failure at the time of death.  Mitchell Dep. at 31.  He ruled out congestive heart failure as a cause of death because Taylor did not have "significant fluid backup into any of the spaces of the legs," as would

be expected if she were in uncompensated congestive heart failure. <u>Mitchell</u>
<u>Dep</u>. at 31.   Dr. Mitchell concluded that Taylor died due to sudden cardiac
death.  <u>Mitchell Dep</u>. at 31, 33, 34-35, 36-37. There was mild congestion in
the respiratory system, which indicated sudden cardiac stoppage.  <u>Mitchell</u>
<u>Dep</u>. at 33. The liver was "a little bit enlarged and, again, congested,
indicating sudden cardiac stoppage." <u>Mitchell Dep</u>. at 33.  Dr. Mitchell also
noted that Taylor had "fundic gastritis." <u>Mitchell Dep</u>. at 37.

Kriegh Moulton, M.D. is a board-certified cardiologist and the
defendants' expert.  In addition to his clinical practice, he is a board certified
cardiologist and is certified for subspecialties in clinical cardiac
electrophysiology and cardiovascular disease. <u>Moulton Dep</u>. at 5-7; <u>ACH</u>
<u>Ex.</u> AAA, BBB. He also teaches fellows training in cardiac
electrophysiology.  Cardiac electrophysiology deals with the diagnosis and
treatment of heart rhythm disorders. <u>Moulton Dep</u>. at 6.

Dr. Moulton concluded that Taylor most likely died due to a "sustained
ventricular tachyarrhythmia in the setting of a chronic nonischemic
cardiomyopathy." <u>Moulton Dep</u>. at 15-16.  The likelihood of tachyarrhythmia
as the mechanism of death "would approach 100%." <u>Moulton Dep</u>. at 50;
<u>ACH Ex. DDD</u> (Moulton Report) ("Sudden, unexpected death is invariably

due to ventricular tachycardial fibrillation and typically occurs in the absence of any signs or symptoms that would predict an imminently fatal event."). According to Dr. Moulton, Taylor's fatal arrhythmia could not have been predicted. Moulton Dep. at 89.

Dr. Moulton testified that Taylor's blood pressure was not significantly elevated and was not capable of precipitating a lethal ventricular arrhythmia. Moulton Dep. at 9, 83.  As to Taylor's medications, Dr. Moulton testified that not having her heart medications for 1-2 days would not be expected to have lethal consequences. Moulton Dep. at 9, 83.  Missing a dose or two will not cause a lethal arrhythmia. Id. "The probability ... that giving her her medicines [at the jail] might have had some preventative effect in the ensuing 36 hours would be extremely unlikely but more properly unknown." Moulton Dep. at 58. Dr. Moulton also noted that her CHF was well compensated at the jail.  ACH Ex. DDD at 2.  Dr. Moulton testified that the reported vomiting was not a significant factor with respect to Taylor's heart condition. Moulton Dep. at 64. 114. He testified that even significant vomiting over two or three days would not be expected to cause her death.  Moulton Dep. at 68-69.

Plaintiff counters with his own expert, Dr. Weinstein, who posits that Taylor's vomiting caused an electrolyte imbalance, which in turn caused Taylor's fatal arrhythmia.  Dr. Weinstein's opinions pertaining to Taylor's cause of death, however, were stricken in the court's order of October 17, 2007.  (d/e 160).

Dr. Moulton also testified that the chest pain reported by Taylor at intake was most likely related to her gastritis (discovered after the fact). Moulton Dep. at 46.  Dr. Moulton further testified that chest pain is not ordinarily associated with arrhythmia. Moulton Dep. at 49-50.  Chest pain "wouldn't be unheard of for someone who has a cardiomyopathy . . . It doesn't clinically mean anything, meaning that it's not a sign of an impending problem."  Moulton Dep. at 88.

Regarding the tachyarrhythmia, Dr. Moulton testified (Moulton Dep. at 49-50):

> Q: Well, ultimately, she died of -- your most likely cause you have is tachyarrhythmia which -- would she have had chest pain when that was going on?
>
> A: (Shaking head from side to side.)
>
> MR. PRETORIUS: You have to say no.

A: I'm sorry. No. When she developed the arrhythmia, she would have fainted. She would have gone in an instant from an awake, conscious state to unconsciousness. And it's not heralded by any symptom such as pain. There might be palpitation -- there frequently is -- but that would not be a symptom that one has any time to complain about because no sooner than this palpitation starts, their loss of consciousness is beginning, and it's really the lights go out.

Dr. Moulton further testified that "had an acute change in her cardiac condition occurred while in jail – theoretically leading to fulminant, decompensating heart failure – the dreadfully intolerable inability to breathe would not have gone unnoticed." Id.

Dr. Johnson prepared and approved protocols to be followed by the ACH medical staff at the jail. Johnson Dep. at 18-20, 74. These included procedures for heroin withdrawal and for conditions requiring automatic referral to a physician. Johnson Dep. at 53, 74; ACH Ex. JJ.  Dr. Johnson testified that the general procedure is that, when a nurse sees one of the symptoms that require an automatic referral, the nurse telephones Dr. Johnson and puts the inmate on the call list for the next time Dr. Johnson is at the jail for sick call.  Johnson Dep. at 22-23.  If an inmate comes in with a history of medications, the nurses generally try to document that history, the best way being to contact the inmate's physician.  Johnson Dep. At 26.

Only Dr. Johnson prescribed medications for inmates at the Jail and determined what medications inmates received.  Johnson Dep. 76; Mattus Dep. 53; Hibbert Dep. 47.

The Advanced Correctional Health Care protocols require an inmate experiencing heroin withdrawal to be examined by the on-site staff for general appearance, respiratory or cardiac irregularity, vitals (temperature, pulse, respiration) and blood pressure.  Plaintiff's Ex. 2 at 207.  If the nurses felt an inmate was going through heroin withdrawal, they would go ahead and start the inmate on the heroin withdrawal protocol and schedule a doctor appointment.  (Hibbert Dep. at 73).  Dr. Johnson was at the jail three days per week – Monday, Wednesday and Friday.  Taylor arrived after Johnson left the jail on Wednesday and died before he arrived on Friday.  She would have been seen at sick call on Friday if she were still complaining of withdrawal. Johnson Dep. at 54.  Dr. Johnson felt that the nurses followed protocol in this regard.  Johnson Dep. at 54.  Dr. Johnson was also available to the nurses by phone, 24 hours a day, seven days a week.  Johnson Dep. 23, 76.  Johnson testified that heroin withdrawal is not a medical emergency. The inmate would fill out a sick call slip and be seen at the first available time. Johnson Dep. at 64.

The ACH protocols specify that the physician will automatically see a patient with chest pain.  Plaintiff's Ex. 2 at 208.  Automatic referral means that the nurse calls Dr. Johnson and puts the inmate on the doctor sick call list for the next time the physician is at the jail.  Johnson Dep. at 22-23.  When a patient has chest pain, "cardiac etiologies need to be ruled out."  Johnson Dep. at 23.  Dr. Moulton testified that chest pain indicated an exam for possible cardiac problems, depending on the protocols.  Moulton Dep. at 46.

There is also a protocol for circulatory/chest Pain - Cardiac, which requires a physician referral for all cardiac chest pain. Johnson Dep. at 74; Plaintiff's Ex. 2 at 208. The cardiac chest pain protocol states that the patient should be examined, vitals and blood pressure taken.  The protocol further states that the inmate should be questioned about the duration of the pain, whether it is a "crushing substernal chest pain or pressure," whether the patient is experiencing nausea and vomiting, dyspnea (shortness of breath) or radiation pain.  Id. The protocol defines cardiac chest pain as an emergency and states that oxygen should be started and nitroglycerine given, among other procedures.  Id.  ACH's protocol for

"nausea and vomiting" protocol requires referral to a physician if "abnormal vital signs" are present.  Plaintiff's Ex. 2 at 205.

Lester Gayton, Taylor's brother, was appointed Special Administrator of Taylor Estate on July 26, 2004.  He filed this case on October 13, 2004. Dr. Bowman, the physician listed by Taylor as her doctor in jail records, died on November 2, 2004.  The plaintiff asserts, and the defendants do not dispute, that the defendants sent an investigator but were not able to obtain Dr. Bowman's records on Taylor.  There is no further explanation about why Dr. Bowman's records on Taylor are not in this record, nor does plaintiff say what efforts he made to obtain those records.

## Analysis

### I.  Federal Claims

### A.  Medical Treatment: Nurses Radcliff, Mattus, and Hibbert

"It is well-established that, while in the custody of state or local authorities, a pretrial detainee must be afforded certain protections under the Fourteenth amendment, including access to adequate medical care." Jackson v. Illinois Medi-Car, Inc., 300 F.3d 760, 764 (7th Cir. 2002).  The claim arises under the due process clause of the Fourteenth Amendment, which the Seventh Circuit has stated affords protections "at least as great

as the protections afforded a convicted prisoner under the Eight

Amendment." Id.  In practice the standards are so analogous as to be

synonymous.  *See* Jackson, 300 F.3d at 764-65; Chapman v. Keltner, 241

F.3d 842, 845 (7th Cir. 2001); Chavez v. Cady, 207 F.3d 901, 904 (7th

Cir.2000).  A pretrial detainee must show that "(1) an objectively serious

injury or medical need was deprived; and (2) the official knew that the risk of

injury was substantial but nevertheless failed to take reasonable measures

to prevent it."  Jackson, 300 F.3d at 764-65; Chapman, 241 F.3d at 845

(Eighth Amendment protection against deliberate indifference to serious

medical need "is extended to arrested persons and pretrial detainees under

the Due Process Clause of the Fourteenth Amendment."); Chavez, 207

F.3d. at 904.

      "'A "serious" medical need is one that has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay

person would easily recognize the necessity for a doctor's attention.'"

Jackson, 300 F.3d at 765, *quoting* Gutierrez v. Peters, 111 F.3d 1364, 1371

(7th Cir.1997).  The condition need not be life-threatening.  An objectively

serious condition also exists if "'failure to treat [it] could result in further

significant injury or unnecessary and wanton infliction of pain.'"  Reed v.

McBride, 178 F.3d 849, 852 (7th Cir. 1999), *quoting* Gutierrez, 111 F.3d at 1373.

The subjective component, deliberate indifference, is not negligence. Deliberate indifference is intentional conduct or conduct so reckless "'that the deliberate nature of the defendant's actions can be inferred.'" Jackson, 300 F.3d at 765 (citation omitted). "[T]o establish deliberate indifference, the plaintiff must proffer evidence 'demonstrating that the defendants were aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps to protect him from a known danger.'" Jackson, 300 F.3d at 765.

### *Chest Pain and Heart Condition*

Taylor's heart condition was a serious, chronic condition. She had a high risk of dying (40-60%) if she did not take her medications regularly (which she did not)[5]. An inference can be drawn that the nurses knew of this serious condition. Taylor had reported it to them during her various incarcerations. Taylor had brought prescriptions with her for her heart

---

[5]Plaintiff asserts that Taylor may have gotten prescriptions filled elsewhere or gotten free samples, but this is speculation. The only reasonable inference that arises from this record is that Taylor took her heart medications only sporadically. Contrary to Plaintiff's assertion, there is no evidence that Taylor was taking those medications when she was incarcerated in October. Her last documented prescriptions would have run out in August and were not attempted to be refilled until October.

condition in August that were approved by Dr. Johnson.  Taylor had been

taken to the emergency room for chest pains at least twice during her

arrest.  And, during Taylor's early July incarceration, Nurse Mattus sought

information on Taylor's condition from Dr. Schmidt, the cardiologist who

treated her at the hospital in Spring 2003.

The record, however, does not demonstrate any deliberate

indifference to Taylor's serious heart condition.

Taylor did complain of chest pain during her intake on October 15,

2008.  Nurse Radcliff arguably did not follow the protocol for chest pain--she

did not call the doctor and put Taylor on the doctor sick call list.  She

apparently did not take Taylor's blood pressure or other vitals.  She did ask

Taylor about the chest pain and its severity, schedule Taylor for a blood

pressure check, and allow Taylor to call her brother to have him bring her

medications to her.  Radcliff also noted in the records that Dr. Johnson

should be called if Taylor's brother did not bring the medications by the next

day.

Radcliff's failure to follow ACH's general protocol in response to

Taylor's complaint of chest pain does not, by itself, give rise to an inference

that Radcliff was deliberately indifferent to Taylor's chest pain.  Internal

procedures do not set the deliberate indifference standard. *See* Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2006). There is no indication that Taylor was experiencing "cardiac chest pain," the kind of "crushing substernal chest pain or pressure" or serious shortness of breath that signaled an emergency. Radcliff did not refuse to carry out Dr. Johnson's specific treatment orders for Taylor or refuse to give medications for Taylor already at the jail, like the cases cited by Plaintiff. *Cf.* Gil v. Reed, 381 F.3d 649 (7th Cir. 2004)(failure to give antibiotic prescribed by prison staff); Wynn v. Southward, 251 F.3d 588 (7th Cir. 2001)(prisoner stated claim where officers lost his heart medicine and then ignored his demands for it); Ralson v. McGovern, 167 F.3d 1160 (7th Cir. 1999)(refusal to give pain medicine prescribed by prison doctor); Donald v. Cook County Sheriff's Dep't, 95 F.3d 548, 555 (7th Cir. 1996)(jail officials confiscated heart medication).

There is no competent evidence that Taylor's existing heart condition coupled with her complaint of chest pain required an immediate call to and examination by a physician. There is no evidence that Radcliff's failure to do so amounted to "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate . . . [she] did not base the decision on such a judgment." Estate of Cole v. Pardue,

94 F.3d 254, 261-62 (7th Cir. 1996); *see also* Collingnon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances.").

Nor does any inference of deliberate indifference arise from Radcliff's reliance on Taylor's brother to bring her medications. There is no suggestion that Radcliff had any reason to believe Taylor's brother would not follow through, nor did Taylor's brother inform the jail when he was unable to retrieve the medications. In any event, Dr. Moulton testified that the medications would not have made a difference in the short window of time here. Further, India's prior incarcerations would not have put Radcliff on notice of any such urgency. Taylor did not receive them at all during her July incarceration, and there were days she refused to take them in her August incarceration.

Nurses Mattus and Hibbert did not follow up on the status of the medications the next day. If they had checked Taylor's medical notes in the late afternoon or evening of October 16, 2003, they would have discovered that the medicines had not been delivered and, per Radcliff's note, should

have called Dr. Johnson.  This is not deliberate indifference to Taylor's heart condition.  As discussed above, there is no evidence that Taylor needed her medications immediately or that she was suffering from any other emergent medical need.  Dr. Johnson was scheduled to see patients at the jail the next day.  Taylor was no longer complaining of chest pain.        Most importantly, there is no evidence that the nurses' purported failures caused Taylor's death or caused her injury or damages.  "To satisfy section 1983, . . . [Plaintiff] must demonstrate not only that . . . [Defendants] violated his constitutional rights, but also that the violation caused . . .[Plaintiff] injury or damages."  Harris v. Kuba, 486 F.3d 1010, 1014 (7th Cir. 2007), *citing* Berman v. Young, 291 F.3d 976, 982 (7th Cir. 2002)("noting that 'plaintiff must 'produce evidence that she sustained actual injury and that her injuries had a causal connection with the alleged due process violation'")(omitting citations).

Dr. Moulton testified that 36 hours of the medications would not have prevented Taylor's death, nor would missing a day or two of those medicines.  He also testified that Taylor's chest pain was caused by gastritis, not by her heart condition, and that the chest pain did not foreshadow her fatal arrhythmia.  He testified that if Taylor's heart condition

had taken a serious turn for the worse, she would have experienced a

"dreadfully intolerable inability to breathe . . . ., " which did not happen.  He

testified that the reported vomiting did not cause Taylor's fatal arrhythmia.

According to Dr. Moulton, Taylor's arrhythmia came on suddenly with little

or no warning or symptoms.  The only way it might have been prevented is

if Taylor had been in a hospital, hooked up to monitors which would have

alerted staff to the arrhythmia in time to use a defibrillator.  There is no

evidence that Taylor's presentation of symptoms warranted hospitalization.

In fact, Dr. Moulton testified that Taylor's heart condition was "well

compensated" during her October incarceration.

Plaintiff argues that the nurses did proximately cause Taylor's death

because, if they had obtained the medicines and called Dr. Johnson, then

Dr. Johnson would have examined Taylor and been "alerted . . . to the risk

of electrolyte imbalance and cardiac arrhythmia . . . . and for the need to

start the medications immediately . . . ."  (d/e 144 p. 7).  Dr. Weinstein's

opinion to this effect has been stricken because he is not  qualified as an

expert on that subject and because his opinion is not based on scientifically

reliable methods.   (10/17/07 Court Order).  Plaintiff also argues that he is

not required to prove causation with exactitude, but his causation argument

is speculation built on speculation, not a reasoned conclusion.  *Cf.* <u>Bass by Lewis v. Wallenstein</u>, 769 F.2d 1173 (7th Cir. 1985)(expert's testimony that chance of survival would have been 10-30% if advanced cardiac life support had been timely administered was sufficient to uphold jury verdict)(case cited by Plaintiff).

Plaintiff also seems to argue that causation may be inferred simply from the nurses' failures and Taylor's death.  The cause of India Taylor's death, however, is not within the layman's experience and knowledge, unlike the effects of a failure to give prescribed antibiotics in the case cited by Plaintiff, <u>Gil v. Reed</u>, 381 F.3d 649, 652 (7th Cir. 2004).  In short, Plaintiff has not come forth with competent, admissible evidence to prove a connection between the nurses' failures and Taylor's death.

### *Vomiting and Heroin Withdrawal*

As discussed above, there is no competent evidence connecting Taylor's vomiting with her heart condition or death.  There is also no competent evidence connecting her claimed heroin withdrawal with her heart condition or death.

That does not end the inquiry, though.   Untreated heroine withdrawal or prolonged vomiting, in the right fact scenario, might present a serious

medical condition if failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" Reed v. McBride, 178 F.3d 849, 852-53 (7th Cir. 1999), *quoting* Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997).  *See* Davis v. Carter, 452 F.3d 686 (7th Cir. 2006)(case survived summary judgment where evidence allowed inference that county had policy of failing to timely provide continuing methadone treatment); Greeno v. Daley, 414 F.3d 645 (7th Cir. 2005)(frequent vomiting and severe heartburn over period of years was serious medical need).    No such inferences arise here.  None of the nurses believed that Taylor was actually undergoing heroin withdrawal and their conclusions were rationally drawn. That misses the point, however.  Even if Taylor's vomiting was attributable to heroin withdrawal, there is no evidence that the vomiting was serious enough to require the start of heroin withdrawal medication immediately, before Dr. Johnson was scheduled to see patients on October 17, 2003. India had essentially three vomiting episodes over the course of 24 hours and complained of nausea during that time.  The first was when she vomited in her cell during the night or early morning of October 15-16; the second was in front of Mattus a few hours later; and the third was at the bonding hearing on the afternoon of October 16, 2003.  Other than that,

Taylor was observed sleeping, walking to her bonding hearing, and also observed with an improved condition after the bonding hearing, stating that she was "feeling better."  No one observed or reported any other symptoms, nor did India complain of any other symptoms (other than her one-time complaint of chest pain at intake).  Perhaps the nurses could have given India anti-nausea medicine and a clear liquid diet, but not doing so did not amount to deliberate indifference to a serious medical need.

Nurse Hibbert's conduct in the afternoon of October 16, 2003, should be separately addressed, however.  Accepting the officers' account, Hibbert refused to even look at Taylor despite the officers' voiced concerns for Taylor's condition and their belief that Taylor should be evaluated by medical.  Instead, Hibbert pushed Taylor off to the next shift, hours away, telling the officers to put in a sick call for Taylor.   Officer Browning was concerned enough about Hibbert's refusal to write an incident report against Hibbert.  Officers Browning and Eccles were concerned enough about Taylor's condition that they helped her fill out a sick call request and put the request in the nurses' box.[6]  Mysteriously, the sick call request put in by the

---

[6]Hibbert remembers this differently.  The court is not deciding whose version is true.  The court is required to draw all inferences in Plaintiff's favor at this point.

officers during Hibbert's shift disappeared. The inferences that come to mind are not flattering.

Yet, as discussed above, even if Hibbert exhibited deliberate indifference in the afternoon of October 16, 2003, it was not deliberate indifference to a serious medical need. Taylor vomited during the bonding hearing and complained of heroin withdrawal. Yet it is undisputed that she was no longer vomiting by the time the hearing was over, when the officers spoke to Hibbert. No other symptom was reported other than the vomiting, which had ceased. By the time the officers helped Taylor fill out the sick call request, Taylor looked and felt better. In short, Hibbert may have ignored Taylor in the afternoon of October 16, but Taylor did not have a serious medical need. Taylor's vomiting and her heroin withdrawal were not connected to her heart condition, at least on this record.

As for Mattus, who came on call at 8:00 p.m. on October 16, 2003, even if she did see the sick call request, Taylor had stopped vomiting by then and reported feeling better. There was no reason for Mattus to call Taylor out of her cell before the sick call scheduled early in the morning on October 16, 2003, for which Taylor was already scheduled for a blood pressure check.

In sum, a rational juror could <u>not</u> find from the evidence that the nurses were deliberately indifferent to Taylor's serious medical needs or that the nurses' conduct was a proximate cause of injury, death or damages to Taylor.  The court need not address the other defendants' arguments for summary judgment, because the court's conclusion that the nurses did not violate Taylor's constitutional right to medical care necessarily means that the claims against the other defendants fail.[7]  *See* <u>Harper v. Albert</u>, 400 F.3d 1052 (7th Cir. 7th Cir. 2005)(where no underlying excessive force claim, failure to intervene claim fails); <u>Treece v. Hochstetler</u>, 213 F.3d 360 n. 2 (7th Cir. 2000)(municipality cannot be liable for constitutional violation unless individual officer is liable); <u>Tesch v. County of Green Lake</u>, 157 F.3d 465, 477 (7th Cir.1998)(if no underlying constitutional violation, no liability on failure to train claim).

## B.  Access to Courts

Plaintiff's access claim remains difficult to discern.  He argues that the defendants destroyed or failed to preserve key facts, hindering his ability to pursue Taylor's claim and/or reducing the value of the claim.  He points to the missing reverse side of the intake screening form from October 15, 2003

---

[7]In any event, the record does not support a finding that any of these defendants were personally responsible for the asserted failures of the nurses.

and to the missing sick call request form submitted by Officers Eccles and Browning.

Plaintiff does not explain how having the reverse side of the October intake form might be necessary to help him make his case.  An example of the reverse side is in the record from the August incarceration–it is a checklist for additional symptoms.  The court does not see how its absence affects Plaintiff's ability to prove his claim.  The first page of the October intake form already establishes notice of India's medications, heart problem and chest pain.  Officer Brownell completed the form and testified to its contents and to India's complaints.  Officer Brownell was also present during Nurse Radcliff's interaction with Taylor.  The evidence of Taylor's complaints and Radcliff's response is already in the record.

Similarly, Officers Brownell and Eccles testified to filling out and submitting the sick call request.  They testified why they filled it out and what happened at the bonding hearing.  Their incident reports and confidential memoranda are in the record and their depositions were taken. Plaintiff does not explain how the absence of this form hindered his ability to prove his case or reduced its value.  Even if these two documents were deliberately destroyed, their absence did not hinder Plaintiff's ability to

pursue this claim.  *See* Harrell v. Cook, 169 F.3d 428, 432 (7th Cir. 1999)("Deliberate destruction of evidence can sabotage a case . . ., if it effectively deprives the plaintiff of essential proof . . ."; "mak[ing] hollow the right to seek redress").

Plaintiff also argues that Dr. Johnson should have done more after Taylor died by performing his own review for compliance with his protocols. Plaintiff contends that Dr. Johnson tried to silence complaints about the nurses after Taylor's death, as evidenced by Superintendent Smith's e-mail. Plaintiff posits that Dr. Johnson should have interviewed witnesses, the nurses, and Taylor's family, as well as searching Taylor's residence.  He asserts that Dr. Johnson should have contacted Dr. Bowman after Taylor's death and done more to help determine the cause of death.

As far as the Court understands Plaintiff's argument, Dr. Johnson should have done these things in order to clarify the factual record regarding India's cause of death, the extent of her chest pains and vomiting, and her medication history.  The court does not understand how these allegations against Dr. Johnson might fit into a constitutional access claim, or any claim for that matter.  Dr. Johnson did  not cover-up or conceal evidence.  Plaintiff had access to the same evidence as Defendants.  The

problem with Plaintiff's case is not his access to evidence, it is that the

evidence he accessed does not prove his case.  Summary judgment will

therefore be granted to Defendants on this claim as well.

## III.  State Claims

Plaintiff pursues state tort claims based on the same conduct as his

federal due process claim.  Having concluded that no basis for federal

jurisdiction exists, the Court could decline supplemental jurisdiction over

these state claims.  28 U.S.C. Section 1367(c)(3);  O'Grady v. Village of

Libertyville, 304 F.3d 719, 725 (7th Cir. 2002)(upholding dismissal of state

claims after constitutional claims disposed of); Groce v. Eli Lilly Co., 193

F.3d 496, 500 (7th Cir.1999)(district court has "discretion to retain or refuse

jurisdiction over state law claims").

However, considerations of "judicial economy, convenience, fairness,

and comity" weigh in favor of exercising supplemental jurisdiction.

Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988).  This is

because the state claims suffer from the same fatal flaw as the federal due

process claim: there is no evidence that the nurses proximately caused

Taylor's death or any injury or damage to Taylor.  "'Under Illinois law,

'proximate cause can only be established when there is a reasonable

certainty that the defendant's acts caused the injury.'" <u>Wintz v. Northrop Corp</u>., 110 F.3d 508, 515 (7th Cir. 1997), *quoting* <u>Schultz v. Hennessy Industries</u>, 222 Ill.App.3d 532 (1991).  Because Plaintiff has not shown that the nurses' actions or inactions proximately caused injury or death to Taylor, the state claims must fail, even if Plaintiff establishes that the nurses did not follow the standard of care.  Accordingly, the court need not address whether Plaintiff established the correct standard of care applicable to the nurses or whether they followed that standard.

<u>CONCLUSION</u>

THEREFORE, the Motions for Summary Judgment by the defendants are GRANTED (d/e's 127, 128, 129, 130, 131, 132).  The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff.   This case is terminated.

ENTER:   April 21, 2008

*s/ Byron G. Cudmore*

_____
BYRON G. CUDMORE
UNITED STATE MAGISTRATE JUDGE